Filed 3/16/17 (after rehearing)

CERTIFIED FOR PARTIAL PUBLICATION[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E062962 |
| v. | (Super.Ct.No. FVI1302657) |
| PHILIP RAYMOND MEJIA, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Debra Harris, Judge. Affirmed with directions.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 1 through 3 of the Legal Analysis.

1

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Philip Raymond Mejia appeals his conviction for torture, spousal rape, spousal abuse, and criminal threats. We reject his contention that the court should have conducted a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) based on defendant's statements during a hearing on his request to represent himself. We also reject his contentions concerning the improper admission of evidence. We agree, however, that Penal Code section 654[1] requires remand for resentencing.

## PROCEDURAL HISTORY

Defendant was charged with one count of torture (§ 206; count 1); one count of spousal rape with tying and binding (§§ 262, subd. (a)(1), 667.61, subds. (b), (e)(5); count 2); one count of infliction of corporal injury on a spouse (§ 273.5, subd. (a); count 3); and one count of criminal threats (§ 422; count 4). As to all four counts, the information alleged that defendant administered methamphetamine to the victim in the commission of the offenses.

A jury returned guilty verdicts on all four counts. It found the allegation of tying and binding true, but found the allegation of administration of methamphetamine not true as to all counts.

---

[1] All further statutory citations refer to the Penal Code, unless another code is specified.

2

The trial court imposed the upper term of four years in state prison on count 3, with a consecutive term of eight months on count 4. On count 2, the court imposed a term of 15 years to life, and on count 1, it imposed a term of "seven years to life" in state prison.[2] Defendant filed a timely notice of appeal.

FACTS

Defendant and the victim met when she was 15 years old. When she was 18 or 19 years old, they were married. By the time the victim was 20 years old, she had three children. She and defendant used methamphetamine together but stopped when the third child was born. From the beginning, defendant said "mean things" to the victim and would sometimes hit her. In approximately March 2013, when defendant lost his job, his abusiveness slowly got worse. On one occasion, defendant burned her leg with a methamphetamine pipe when she said she did not want to smoke the drug. On another occasion, he hit her all over her body with a wooden flute. Other times, he hit her on her head with his hands.

The victim suspected that defendant had cheated on her, but she "couldn't question what he was doing." Talking back to defendant or not wanting to do what he asked would "set him off." In order to start a conversation about infidelity, she told him, untruthfully, that she had cheated on him. He was angry and talked about punishing her. He said there were "consequences." On other occasions, defendant would handcuff her to the bed frame and make her lie on the floor. They had occasionally used the handcuffs

_____

[2] The penalty for torture is "imprisonment in the state prison for a term of life." (§ 206.1.)

3

during sex, for "fun purposes," but after that, it "wasn't fun anymore." Defendant would sometimes leave her handcuffed to the bed for hours or days at a time. While she was handcuffed, she was not able to eat or drink water. Defendant would "sometimes" allow her to go to the bathroom, but sometimes she was forced to "go" on herself. The handcuffs sometimes cut or bruised her wrists.

At some point, defendant began to video record their sexual activity. The victim could not remember why it started, but it was after defendant lost his job. She was "kind of okay" with it in the beginning, but sometimes she would get embarrassed and push the cell phone or camera away. At the beginning, there were no handcuffs or abuse, other than defendant "being mean" and telling her what to do. Defendant became increasing abusive, hitting her, using a Taser on her, keeping her from her children and handcuffing her. She had "too many [Taser] marks to count" on her chest and stomach. He "tased" her once while she was tied to a chair.

Defendant taped her to a chair with duct tape and put duct tape over her mouth, making it hard to breathe. On one occasion, she was bent across the chair on her stomach, with her head on the floor. Defendant had intercourse with her while she was bound. She shook her head to indicate that she did not want to, but she could not otherwise protest. He also engaged in anal intercourse with her on some occasions, even though she said she did not want to, because it hurt. Although she sometimes engaged willingly in oral sex, there were times when she did not want to do it, but did anyway so that defendant would not hit her or handcuff her. Defendant would sometimes force her. On one occasion, he sodomized her with a socket wrench.

4

At one point, defendant cleared the victim's clothes out of the bedroom closet and put a baby mattress on the floor. He locked her in the closet with a bucket and told her to stay there and not move. He said he was going to have other men come to the house and force her to orally copulate them. He also threatened to sell the videos on YouTube. He threatened to wrap her in a rug and set her on fire. He once threw gasoline on her while she was in the closet. Then he shut her in the closet and left her there for hours. On one occasion, he cut the side of her thigh with a small screwdriver.

At one point, the victim asked defendant to let her kill herself. He tied a rope around her neck and had her stand on a bucket. He kicked the bucket away and let her hang while he was holding the rope. The rope cut her neck.

The victim did not have a key to the couple's apartment. Defendant screwed the front door closed to keep people from coming in. He also added locks to the door. There was also a surveillance camera in the living room.

At least once, defendant hit the victim so hard that she lost consciousness. He revived her by throwing ice on her. On one occasion, he put duct tape on her face, put a wet towel on her face and over her nose, and poured water on her. She could not breathe. Defendant had a device he said was used to strangle a person and threatened to use it on her, to frighten her. He never used it, however.

On August 21, 2013, the victim was late getting the oldest child ready for school. Defendant smacked her with his hand on the back of her head. She then got the middle child ready for school. Defendant took that child to school; the oldest one stayed home. Before defendant left, he hit the victim on the back of the head again and said he would

5

"beat the shit" out of her. However, when he left, he left the door unlocked. She ran to a neighbor's apartment with the two children and called the police. The neighbor said that the victim appeared "petrified." While she was on the phone with the police, she could hear defendant shouting because he could not find her. She had multiple bruises on her face from prior incidents.

The police officer who responded first spoke to the victim and observed her injuries, including burn marks on her stomach. He then entered the couple's apartment. He found a Taser in a drawer in the bedroom, a baggie of methamphetamine in a tool box, and handcuffs on the bedroom floor. He also observed a live feed from a camera in the living room, being shown on a television screen. He saw a toddler bed in the closet and observed that the closet locked from the outside.

Detectives who arrived later spoke to the victim and observed that she was extremely thin[3] and had multiple cuts, bruises and abrasions in various stages of healing, and Taser marks on her stomach. In the couple's apartment, the detectives found a strangulation device and handcuffs in the bedroom, a bag of methamphetamine and a methamphetamine pipe, a rope and a gasoline can. They also found several digital flash drives containing videos of various sexual acts.

Thirteen videos were played for the jury. A transcript of the conversations heard on the videos was provided to the jury and admitted into evidence.

---

[3] On August 21, 2013, the victim weighed 82 pounds.

6

In one of the videos, defendant said to the camera, "The reality of it is, is yes, if she does anything stupid I will kill her.  Number two, she thinks that camera's a joke.  [Its purpose] is to show you, when you fuck with the wrong person, husband, wife, child . . . you do the wrong things, there's a consequence sooner or later in life."

At another point, he said, "[I]t was her choice.  She chose this okay um . . . she has bruises all over her legs.  I did that.  I did that because I tied her ass up, I beat the shit out of her, I tased her.  I fucked her in the ass and I did everything I fuckin' wanted to do and I could have done more because she's a bitch."  He told the victim that he was recording the session for YouTube, but "[n]ot the rape, not any of that."  He told his "audience" that the victim "may not die" that day, "but you will see what a hostage can and will go through.  There's torture, pain, tape, chains, uh knives, needles, water . . . a lot of things that . . . a person can use to start getting to somebody."  He later told her that if she continued to lie to him, he would put her murder on YouTube.

LEGAL ANALYSIS

1.

THE COURT WAS NOT REQUIRED TO HOLD A *MARSDEN* HEARING BASED ON STATEMENTS DEFENDANT MADE DURING A *FARETTA*[4] HEARING

A court is required to hold a hearing into a defendant's complaint that his court-appointed attorney is not providing competent representation whenever the defendant clearly indicates that he is seeking substitution of counsel.  (*Marsden*, *supra*, 2 Cal.3d at

---

[4] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

p. 123; *People v. Valdez* (2004) 32 Cal.4th 73, 97; *People v. Lucky* (1988) 45 Cal.3d 259, 281 & fn. 8.) Defendant contends that because he expressed dissatisfaction with his attorney during a hearing on his request to represent himself, the trial court was obliged to conduct a *Marsden* hearing. As we discuss, however, defendant made it clear during that hearing that he was not seeking substitution of counsel but wanted to represent himself. Accordingly, the court had no duty to conduct a *Marsden* hearing.

The issue arose as follows: On April 10, 2014, the trial court commenced a *Marsden* hearing based on its understanding that defendant wanted a new attorney. However, defendant explained to the court that he was not seeking a new attorney. What he wanted was to have his "conflict answered." He did not elaborate as to what that meant. Because defendant stated unequivocally that he did not want a new attorney, the court concluded the hearing.

On November 21, 2014, the court again convened a *Marsden* hearing. The court stated that it had received a "conflict of interest and complaint letter." In the letter, defendant stated that he wanted his public defender, Michael Mendoza, dismissed for incompetence. Defendant stated that Mr. Mendoza was not communicating with him, that he had breached defendant's direction not to negotiate with the district attorney, that he had failed to retrieve evidence defendant wanted him to obtain, that he had failed to file a *Pitchess*[5] motion, and that he had failed to ensure a hearing on the record of a

---

[5]  *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, superseded by Penal Code section 832.5 et seq. and Evidence Code sections 1043 and 1045, as stated in *Long Beach Police Officers Assn. v. City of Long Beach* (2014) 59 Cal.4th 59, 67-68.

8

motion, filed by defendant personally, seeking to set aside the information pursuant to section 995. The court listened to defendant's grievances, obtained counsel's explanations for his actions and inactions, and determined that defendant had failed to show incompetence by Mr. Mendoza. Accordingly, it denied the motion.

On December 5, 2014, defendant made a request to represent himself, pursuant to *Faretta*, *supra*, 422 U.S. 806. After the court explained to defendant the pitfalls of self-representation, the court asked defendant if he still wanted to represent himself. Defendant replied, "I do, but it's not willingly." He explained that he felt compelled to represent himself because he was being held against his will and because "the representation that I've been receiving from Mendoza is from the state, who is also prosecuting me." The court agreed to let defendant represent himself if he signed a waiver. Defendant refused to do so. After a consultation with Mr. Mendoza, defendant was given permission to address the court. This was done off the record.

The following court day, the court revisited defendant's request for self-representation and explained again that the court could not allow him to represent himself unless he gave an unequivocal waiver. The court explained various reasons, apart from lack of an unequivocal waiver, that would justify denial of the motion. The court then asked defendant if he was satisfied with having counsel represent him. Defendant replied, "Absolutely not." He explained again that he was forced to represent himself because he was being held against his will. He said that he was dissatisfied with Mr. Mendoza's representation, but that he had "already had [a] *Marsden* hearing trying to fire him and that hasn't solved nothing." He said, "I feel I'm forced when I do not wish

9

to participate in what's taking place in this courtroom, which I feel is fraud under Article 3, Section 2, 1217 [*sic*] of the constitution where only common law or military tribunal venue is allowed in this courtroom. I do not want to participate in the fraud, at all. I understand what's taking place in this courtroom and I do not accept it whatsoever. And there is no one on my side and understanding what's going on in this courtroom but me. I'm sure you may understand what's taking place, which is why I asked the District Attorney to provide some form of jurisdiction to show that she has the right to bring this claim to this courtroom and to continue to proceed in this process."[6]

---

[6] We infer that defendant was referring to Article III, section 2, of the United States Constitution. Article III, in pertinent part, provides:

"Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

"Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;— between a State and Citizens of another State,—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

"In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

"The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."

After further discussion, during which the court suggested that an evaluation of defendant's competency to represent himself might be in order, the court again found that defendant had not unequivocally asked to represent himself and had not waived his right to counsel. The court asked defense counsel to look into the possibility of requesting the evaluation and continued the proceeding to the following day.

The next day, defendant reiterated his concern about the court's legitimacy "consistent with the constitution of the Supreme Court ruling" that he had referred to previously, i.e., "Article 1, section 8, clause 17."[7] He asked, "What's taking place in this courtroom, common law or admiralty military tribunal venue? And I would like to be told which is taking place." The court asked counsel if he understood what defendant was talking about. Counsel explained that defendant doubted the trial court's jurisdiction and the district attorney's authority to represent the People of the State of California. The court responded that it had already ruled on that issue when defendant raised it in his section 995 motion, and informed defendant that he could raise the issue by writ or on appeal, but that the issue was decided for purposes of his trial.

---

[7] Defendant previously referred to Article III, section 2, of the United States Constitution.

Article I of the United States Constitution enumerates the powers of Congress; section 8, clause 17 authorizes Congress to exercise exclusive legislation over the seat of government of the United States, i.e., Washington, D.C., and to exercise like authority over all places purchased for the erection of forts, magazines, arsenals, dockyards and other needful buildings.

Article I, section 8 of the California Constitution provides: "A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin." It does not have a clause 17. Accordingly, we do not know what defendant meant by this statement.

11

The court then returned to the question of self-representation. The court stated that the only issue defendant had mentioned with respect to his attorney was that Mr. Mendoza refused to make certain statements when defendant wanted him to. The court had previously explained to defendant that counsel knew when a particular statement was or was not appropriate, depending upon the specific issue the court was dealing with at any particular time. Defense counsel explained that the statements defendant wanted him to make were the ones defendant had just made, i.e., concerning the court's authority under Article III of the United States Constitution and concerning the district attorney's authority to try him, and that if he did not make those statements when defendant wanted him to, defendant would just make them on his own. Defendant had been removed from a prior hearing for doing so. After discussion of the limitations on an incarcerated self-represented defendant's ability to prepare for trial and the court's refusal to release him on his own recognizance, defendant concluded that it would be in his best interest to have Mr. Mendoza represent him. It was against his will, he said, but he had no choice. Based on those statements, the court concluded that defendant was not seeking self-representation.

At no time during any of these hearings on self-representation did defendant ask for another attorney to replace Mr. Mendoza or clearly indicate that he wanted a new attorney. The mere mention of dissatisfaction with current counsel during a *Faretta* hearing is not sufficient to trigger the court's duty to hold a *Marsden* hearing. (*People v. Mendoza* (2000) 24 Cal.4th 130, 156-157.) Accordingly, we reject defendant's contention.

12

2.

DEFENDANT DID NOT OBJECT TO EVIDENCE ON THE

GROUNDS HE ASSERTS ON APPEAL

The victim's sister and father both testified for the prosecution regarding their observations of defendant's relationship with the victim.  Defendant now contends that their testimony was inadmissible on several grounds:  That it was improper evidence of prior crimes; that it was irrelevant; that it was improper character evidence and not admissible as evidence of propensity to commit acts of domestic violence as provided by Evidence Code section 1109; and that it should have been excluded under Evidence Code section 352 as more prejudicial than probative.[8]

In order to preserve issues pertaining to the admissibility of evidence for appellate review, the party must make a timely and specific objection on the particular ground he seeks to raise on appeal.  (*People v. Farnam* (2002) 28 Cal.4th 107, 153; see also Evid.

---

[8] As pertinent here, Evidence Code section 1109, subdivision (a)(1) provides: "(a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

13

Code, § 353.)[9]  Here, defendant did not make a pretrial motion to exclude evidence of prior acts of domestic abuse on the grounds he asserts on appeal.[10]  Rather, he objected as the evidence came up during the trial.  We will examine each objection cited by defendant in turn.

At reporter's transcript page 352, the victim's sister, Josephine, was asked if she had ever seen defendant become violent with the victim.  Defense counsel did not object.  Josephine answered that on one occasion, defendant became angry with the victim and pulled her off the bed by her feet, causing the victim to fall on the floor.  After that question, the court summoned counsel to the bench on a related topic.  Defense counsel then said that he had been about to make an objection because it "[s]ounds like we are getting into character evidence, like prior bad acts that [defendant] did."  The court agreed that the prosecutor appeared to be getting into character evidence.  The prosecutor replied, "I plan to move on."  The court responded, "Okay."  Defendant did not seek to have the witness's prior answer stricken, nor did he interpose another objection when the prosecutor resumed questioning the witness.  Accordingly, defendant's objection on

---

[9]  Evidence Code section 353 provides in pertinent part:  "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶]  (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."

[10]  Defendant did seek exclusion of his prior conviction for domestic violence.  The court overruled his objection.  Neither of the two witnesses was asked about the prior conviction.

grounds of character evidence was essentially sustained, and no evidentiary error was preserved for appeal.

At reporter's transcript page 361, defense counsel asked for an offer of proof as to what the victim's father, Dwight, would testify to. He alluded to Dwight's potential testimony generally as not relevant, but did not give a reason that he considered it irrelevant. The prosecutor responded that Dwight would testify about his diminishing relationship with the victim because of defendant's interference, and about his observations that the victim's health appeared to be deteriorating during the relevant period of time. The court overruled the objection. Defense counsel did not interpose any objection to the testimony as described in the offer of proof. Accordingly, no evidentiary issue was preserved for review.

At reporter's transcript page 364, defense counsel objected to Dwight's testimony that one of his daughters had told him that she thought defendant was abusing the victim. The ground for objection was hearsay. The court sustained the objection and ordered the answer stricken. At reporter's transcript page 365, cited by defendant in his opening brief, there is no objection.

Because no timely objection to evidence was made and overruled by the court on the grounds defendant asserts on appeal, we need not address his contentions.

15

3.

DEFENDANT'S CLAIM OF PROSECUTORIAL ERROR OR MISCONDUCT

DURING CLOSING ARGUMENT WAS NOT PRESERVED FOR REVIEW

During her closing argument, the prosecutor stated to the jury that torture is "almost like an umbrella-like crime. It's not necessarily something that happens with one punch, or something that happens with one strangulation, or something that happens with one rape, or one sodomy or one of something. Torture is kind of all-encompassing. And [the victim] talked about it and you see some of the behavior on the videos as well. But it's stuff like when [the victim] describes how the defendant would kind of C-clamp her throat with his hand and hold her up until she got to the point of unconsciousness and he had to splash water on her face to wake her up, coupled with being punched, being kicked, being tased, not having food, being left locked in a closet. It's all of those things, along with the rapes and the sodomy and all of the forcible crimes. It's an umbrella over all of those things." Defendant contends that this is a misstatement of the law and constituted prosecutorial misconduct. Trial counsel did not object, however, apparently preferring to address the prosecutor's remarks in his own argument.

Acknowledging that claims of prosecutorial misconduct are not, as a general rule, preserved for appellate review unless trial counsel makes a contemporaneous objection on the same ground and requests that the jury be admonished to disregard the impropriety (*People v. Samayoa* (1997) 15 Cal.4th 795, 841), defendant contends that the failure to object should be excused because the record demonstrates that an objection would have

been futile. He points out that trial counsel lodged at least nine objections during the prosecutor's rebuttal argument and that the trial court overruled all of them.

We disagree that this shows that an objection to a misstatement of the law, if such it was, would have been futile. Defense counsel's first objection was that the prosecutor had misstated the evidence. The trial court implicitly overruled it, saying, "This is argument." However, the court went on to admonish the jury that arguments of counsel are not evidence, thus achieving the objective of the objection. The rest of defense counsel's objections during rebuttal were based on the contention that the prosecutor's rebuttal exceeded the scope of his closing argument and therefore constituted improper rebuttal. The court overruled them based on the court's recollection that in his argument, defense counsel had touched on the matters the prosecutor raised during her rebuttal. This in no way suggests that the court would not have sustained an objection to a misstatement of the law. Accordingly, we reject the contention that the prosecutor's alleged misstatement of the law was preserved for review despite trial counsel's failure to object.

We also reject defendant's alternative claim that the failure to object constituted ineffective assistance of trial counsel, in violation of his constitutional trial rights. We cannot address such a claim on direct appeal unless the reasons for the challenged act or omission appear on the record or there simply could be no rational tactical basis for counsel's conduct. (*People v. Pope* (1979) 23 Cal.3d 412, 422.) Defendant argues that counsel could not have had a rational tactical reason for failing to object. We disagree. If counsel had objected and the court had sustained his objection, at most the court would

17

have referred the jurors to the instruction and told them that they must follow the court's instructions on the law rather than any conflicting argument by counsel. Instead, counsel countered the prosecutor's description of the law of torture by discussing the instruction defining torture and explaining to the jury why the prosecutor was incorrect. Indeed, he argued that the prosecutor was trying to "bamboozle" them with her argument. We cannot say as a matter of law that this was not a rational tactical choice. Accordingly, the claim of ineffective assistance of counsel fails.

## 4.

## APPLICATION OF SECTION 654

Section 654 provides, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).) Section 654 precludes imposition of an unstayed sentence on the count subject to the lesser punishment. (*People v. Mesa* (2012) 54 Cal.4th 191, 195 (*Mesa*).)

Section 654 has long been interpreted to preclude multiple punishments not only for a single act that violates more than one statute, but for an indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1208.) Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. (*Latimer*, at p. 1208.) "[I]f all of the offenses were merely incident to, or were the means of

18

accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

In his original briefing, defendant contended that section 654 precludes imposition of unstayed sentences on both count 1 and count 3, for torture and infliction of corporal injury on a spouse, respectively, because the evidence showed that he engaged in all of the acts of assault in furtherance of the single objective of causing the victim cruel pain and suffering. In a petition for rehearing, defendant argued for the first time that section 654 also precludes imposition of unstayed sentences on both count 1 and count 2, for spousal rape, and on count 4, for criminal threats, for the same reason, i.e., that all of the offenses committed over the three-month course of conduct were committed in furtherance of that single objective. We granted rehearing to address those contentions. In our original opinion, we addressed the course of conduct arguments, but ultimately concluded that because all of the acts of infliction of corporal injury on a spouse were a part of the means by which defendant committed torture, section 654 precluded imposition of unstayed sentences on both count 1 and count 3. Having reviewed the parties' supplemental briefing with respect to counts 2 and 4, we adhere to our original conclusion that defendant may not receive unstayed sentences on both count 1 and count

19

3 and hold that the same reasoning applies to count 2.  As to count 4, we conclude that section 654 does not preclude imposition of an unstayed sentence.

*Application of Section 654 to Counts 1, 2 and 3*

Torture can be committed either by a single act or by a course of conduct.  (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1429.)  Where torture is tried as a course of conduct crime, it is not necessary that any single act in the course of conduct results in great bodily injury.  Rather, if the requisite intent exists and the cumulative result of the course of conduct is great bodily injury, the crime of torture has been committed.  (*Ibid*.)  Here, the prosecutor argued that torture is not necessarily "something that happens with one punch or . . . one strangulation, or . . . one rape, or one sodomy or one of something."  She argued that in this case, the torture consisted of the acts shown on the videos, as well as "how the defendant would kind of C-clamp her throat with his hand and hold her up until she got to the point of unconsciousness and he had to splash water on her face to wake her up, coupled with being punched, being kicked, being tased, not having food, being left locked in a closet.  It's all of those things, along with the rapes and the sodomy and all of the forcible crimes.  It's an umbrella over all of those things."

The fact that the "umbrella" crime of torture was committed by a course of conduct does not mean that a section 654 "indivisible course of conduct" analysis is appropriate.  We have found no cases that address this issue in the context of

torture by course of conduct.[11]  In *Mesa*, *supra*, 54 Cal.4th 191, however, the California

Supreme Court addressed an analogous issue.  In that case, the defendant was convicted

of active participation in a criminal street gang (§ 186.22, subd. (a)) and of one count of

possession of a firearm by a felon and one count of assault with a firearm.  An element of

section 186.22, subdivision (a), is the requirement that the defendant "willfully promotes,

furthers, or assists in any felonious criminal conduct by members of that gang."  The trial

court instructed the jury that "'[f]elonious criminal conduct means committing or

attempting to commit . . . assault with a firearm, felon in possession of a firearm.'"

(*Mesa*, at p. 197.)  Because the substantive offenses were the acts "'that transformed

mere gang membership—which, by itself, is not a crime—into the crime of gang

participation,'" imposing separate punishment on both the substantive offenses and the

crime of gang participation violated section 654.  (*Mesa*, at p. 197.)  Stated another way,

the court held, "[s]ection 654 applies where the 'defendant stands convicted of both

(1) a crime that requires, as one of its elements, the intentional commission of an

underlying offense, and (2) the underlying offense itself.'  [Citation.]"  (*Id*. at p. 198.)

Torture requires the infliction of great bodily injury with the intent to cause cruel

or extreme pain and suffering.  (§ 206.)  To satisfy that element, the statute necessarily

---

**11**  In *People v. Martinez* (2005) 125 Cal.App.4th 1035, the court held that the individual offenses committed during a course of conduct torture, including infliction of corporal injury on a spouse in violation of section 273.5, subdivision (a), were not necessarily included offenses of the torture count, either by the elements test or the pleading test.  Accordingly, the court held, the defendant could be convicted both of torture and of the individual offenses that made up the course of conduct.  (*Martinez*, at pp. 1041-1046.)  The court did not, however, address a contention that section 654 precluded imposition of unstayed sentences on any of the constituent offenses.

21

requires the intentional commission of one or more assaultive acts, such as infliction of corporal injury on a spouse, committed with the intent to cause cruel or extreme pain and suffering. Accordingly, although a defendant may be convicted of both torture and of any or all of the underlying acts (*People v. Martinez*, *supra*, 125 Cal.App.4th at pp. 1042-1046), section 654 precludes imposition of unstayed sentences for both torture and any of the underlying assaultive offenses upon which the prosecution relies to prove that element. (*Mesa*, 54 Cal.4th at pp. 197-198.)

With respect to count 2, for spousal rape, the Attorney General argues that because it can be inferred that defendant acted in furtherance of both an intent to inflict suffering on the victim and an intent to obtain sexual gratification, section 654 does not apply. In *Mesa*, *supra*, 54 Cal.4th 191, however, the court expressly rejected the contention that section 654 would not apply if there was evidence that the defendant harbored multiple criminal objectives in committing the underlying offense and the gang participation crime. The court held that the rule that multiple criminal objectives may be a predicate for multiple punishment applies only in circumstances that involve multiple acts. It held that the rule does not apply where the multiple convictions at issue were indisputably based on a single act, even if the defendant harbored more than one objective. (*Mesa*, at p. 199.) In that case, the single act of illegal possession of a firearm could not be punished both under former section 12021, subdivision (a)(1), and section 186.22, subdivision (a), nor could the single act of assault with a firearm be punished under both section 245, subdivision (a)(2) and section 186.22, subdivision (a). (*Mesa*, at pp. 194-195, 197-200.) Here, because the prosecution relied upon each act of spousal rape and

22

each act of infliction of corporal injury on a spouse as the intentional acts underlying the torture conviction, it is irrelevant whether defendant harbored a single objective or multiple objectives.

Because there are multiple instances of rape and of infliction of corporal injury on a spouse in this case, the above analysis would not apply if the record supported the conclusion that any one of either type of crime was committed outside of the torture course of conduct. Whether a particular offense is part of a course of conduct for purposes of section 654 is a question of fact. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) In the absence of an explicit ruling by the trial court at sentencing, we infer that the court made the finding appropriate to the sentence it imposed, i.e., either applying section 654 or not applying it. (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626-627 (*Tarris*).) Here, there was no discussion at sentencing as to whether section 654 applied to counts 1, 2 or 3. Accordingly, we must affirm the sentence if an implied finding that section 654 does not apply is supported by substantial evidence. (*Tarris*, at pp. 626-627.)

There is no evidence that any of the acts of rape was not a part of that course of conduct, nor did the prosecutor seek to distinguish any of those acts on that basis. As the basis for count 3, the prosecutor relied on the incident on August 21, 2013, the day the victim finally fled.[12] In that incident, defendant "smacked" the victim on the back of her

---

[12] The prosecutor argued: "[As to count 3], the way that it's charged, that corporal injury is specifically going to the date of August 21st when she talked about how he was mad at her because she was not getting the kids ready on time and he hit her in the back of the head, told her he was gonna beat her ass when he got back and she had a big bump on the back of her head on the day that she was beat."

23

head because she was late getting one of the children ready for school. Examining the evidence in the light most favorable to the trial court's ruling (*Tarris*, *supra*, 180 Cal.App.4th at p. 627), we see no basis for concluding that the final assault was either separated in time from the rest of the acts that constituted torture or was in some other manner distinct from those acts. The victim testified to a lengthy series of physical assaults, and there was no evidence that these assaults had ended before August 21. Thus, the record supports only the conclusion that this final act of violence was part of the course of conduct that constituted torture.

Accordingly, because all of the acts of spousal rape and of infliction of corporal injury on a spouse were included among the acts underlying the torture count and were essential to satisfying an element of that offense, section 654 precludes imposition of unstayed sentences on both count 1 and either count 2 or count 3. (*Mesa*, *supra*, 54 Cal.4th at pp. 195-200.)

*Application of Section 654 to Counts 1 and 4*

Count 4, for criminal threats, is subject to a different analysis because, as the Attorney General points outs, threats are neither necessary to the commission of torture nor sufficient to satisfy any of its elements. Accordingly, section 654 applies only if there is no substantial evidence that supports the trial court's implied conclusion that the threats were not part of an indivisible course of conduct. (*Tarris*, *supra*, 180 Cal.App.4th at pp. 626-627.) To determine whether substantial evidence supports that conclusion, we must view the facts in the light most favorable to that conclusion. (*Ibid.*)

24

Defendant contends that the criminal threats were part and parcel of his three-month campaign to "torture, humiliate, break down, and beat down" the victim. He also contends that the threats were part of the torture because the prosecutor relied on the threats to argue that the victim submitted to sexual intercourse through duress and because the victim testified that defendant's threat to kill her was part of the reason she stayed rather than attempting to flee. We agree that a reasonable trier of fact could conclude that all of the crimes committed against the victim were part of defendant's campaign to terrorize her. However, for purposes of section 654, the question is whether the criminal threats were committed in furtherance of the crime of torture. Torture, as defined in section 206, requires the specific intent to inflict cruel or extreme pain or suffering. We understand this to mean *physical* pain or suffering, and defendant does not suggest otherwise. Thus, mentally or emotionally terrorizing the victim by means of threats is an objective separate from the intent to cause extreme physical pain. Accordingly, a reasonable trier of fact could conclude that the criminal threats were in furtherance of a separate criminal objective, even if, in part, the threats were intended to "break" or "beat" the victim down emotionally and to discourage her from attempting to flee, as defendant contends. For this reason, section 654 does not preclude imposition of an unstayed sentence on both count 1 and count 4.

*Execution of Sentence Must Be Stayed on Count 1*

The final question is on which count or counts execution of sentence must be stayed. Section 654 provides that an act or omission that is punishable in different ways

25

by different provisions of law shall be punished under the provision that provides for the "longest potential term of imprisonment." (§ 654, subd. (a).) In this case, count 1, torture, carries an indeterminate life term. (§§ 206, 206.1.) Count 2, spousal rape with tying or binding, carries a term of 15 years to life. (§§ 262, subd. (a)(1), 667.61, subds. (b), (c)(2), (e)(5).) Count 3, infliction of corporal injury on a spouse, carries a term of two, three or four years in state prison if it is sentenced as a felony. (§ 273.5, subd. (a).) Because count 3 unquestionably carries a shorter potential term than does count 1, section 654 requires that it be stayed rather than the life term on count 1, assuming that the sentence on count 1 is not itself required to be stayed. As we discuss below, however, execution of the sentence on count 1 must be stayed. Accordingly, section 654 does not preclude imposition of an unstayed sentence on count 3.

Because counts 1 and 2 are both subject to potential life terms, it is not immediately obvious which of those two sentences should be stayed. We asked the parties for supplemental briefing as to which count provides for the longest potential term for purposes of section 654.

Defendant contends that because both counts carry a potential term of life imprisonment and because there is no way to predict when, or even if, an inmate serving a potential life term will be granted parole, the two sentences are in effect identical. The Attorney General contends that in amending section 654 to include the "longest potential term of imprisonment" language, the Legislature expressed its intention that the unstayed sentence must be the one that carries the longest minimum parole eligibility provision. A

26

person who is serving an indeterminate life term becomes eligible for parole after serving the greater of "(1) [a] term of at least seven calendar years [or] [¶] (2) [a] term as established pursuant to any other law that establishes a minimum term or minimum period of confinement under a life sentence before eligibility for parole." (§ 3046, subd. (a)(1), (a)(2).) Section 667.61 provides for a minimum parole eligibility period of 15 years. (§§ 262, subd. (a)(2), 667.61, subds. (b), (c)(2), (e)(5).) Accordingly, the Attorney General contends, the latter is the sentence with the longest potential term of imprisonment. We agree. Although the maximum potential term for both crimes is life in prison, section 667.61 ensures that a defendant will serve a minimum of 15 years in prison, while section 3046 creates the possibility that a defendant will be released on parole in only seven years. Thus, section 667.61 necessarily provides for a longer actual term of imprisonment than section 3046 necessarily does.

We believe that this interpretation is consistent with the actual wording of section 654. By providing for an unstayed sentence under the provision that provides for the "longest potential term of imprisonment," the Legislature was expressing its intention that the unstayed sentence must be the one which will result in a defendant actually spending the longest period in prison. To the extent that the language is ambiguous, however, we refer to the legislative history of the 1998 amendment of section 654 which

27

added the requirement that sentence must be imposed under the statute that provides for the longest potential term of imprisonment.**13**

That amendment was the Legislature's response to the California Supreme Court's decision in *People v. Norrell* (1996) 13 Cal.4th 1 (*Norrell*). In *Norrell*, addressing the previous version of section 654, the court held that although section 654 prohibited multiple punishments for the same act or omission, the trial courts nevertheless retained the discretion to determine which of several possible punishments to impose. (*Norrell*, at pp. 5-6.) The amendment of section 654 removed that discretion. In Senate Bill No. 914, introduced in the following legislative session, the author identified this as the problem his bill addressed. Citing *Norrell*, the bill's author stated, "Under current law, a defendant who commits one act [that] is punishable by more than one statute may avoid the [more] serious punishment of one statute if the judge imposes a sentence based on the more lenient statute." (Assem. Com. on Public Safety, com. on Sen. Bill No. 914 (1997-1998 Reg. Sess.) July 1, 1997, p. 2.) The author also referred to former Justice Arabian's dissent in *Norrell*, in which he invited the legislation, saying, "I hope the Legislature will heed my call, and amend [section 654] to make clear what should have been clear all

---

**13** "'The goal of statutory construction is to ascertain and effectuate the intent of the Legislature. [Citation.] Ordinarily, the words of the statute provide the most reliable indication of legislative intent. [Citation.] When the statutory language is ambiguous, the court may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes. [Citations.]' [Citation.] '"When the language is susceptible of more than one reasonable interpretation . . . , we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part."' [Citation.]" (*People v. Jefferson* (1999) 21 Cal.4th 86, 94.)

along: when a person commits multiple crimes, the court may not manipulate the sentences to be stayed and not stayed so as to impose a lower overall sentence than the *minimum* the Legislature has decreed for any of those crimes. Additional criminality must never by rewarded." (*Norrell*, *supra*, 13 Cal.4th at pp. 23-24 [dis. opin. of Arabian, J.], quoted in Sen. Rules Com., Off. of Sen. Floor Analyses of Sen. Bill No. 914 (1997-1998 Reg. Sess.), as amended April 15, 1997, p. 2.)

Accordingly, under both the plain meaning rule and by reference to the legislative history of the relevant amendment to section 654, execution of the sentence imposed on count 1, torture, must be stayed and an unstayed sentence imposed on count 2. Because execution of sentence on count 1 must be stayed, defendant is subject to imposition of unstayed sentences on counts 3 and 4 as well.

## DISPOSITION

The cause is remanded with directions to modify the sentence to stay execution of sentence on count 1 pursuant to Penal Code section 654 and to impose unstayed sentences on counts 2, 3 and 4. The judgment is otherwise affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

McKINSTER
J.

We concur:

HOLLENHORST
Acting P. J.

SLOUGH
J.

29