Filed 5/15/26  P. v. Dugan CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064133, G064530 |
| v. | (Super. Ct. No. 22HF0427) |
| ADAM MICHAEL DUGAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment and postjudgment order of the Superior Court of Orange County, Gassia Apkarian, Judge. Affirmed with directions.

Laura Vavakin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Joshua Trinh, Deputy Attorneys General, for Plaintiff and Respondent.

In this consolidated appeal, Adam Michael Dugan appeals from a judgment entered after a jury found him guilty of various crimes and from a

postjudgment order resentencing him to seven years in prison. Dugan argues the trial court erred by failing to: (1) give a unanimity instruction on the criminal threat count; (2) stay the sentence on the criminal threat count under Penal Code section 654 (all undesignated statutory references are to this code); and (3) impose a sentence on the vandalism and first degree residential burglary counts before staying them pursuant to section 654.

We affirm with directions. We conclude the trial court was not required to give a unanimity instruction on the criminal threat count because the same-defense exception applies here. We also conclude the court did not err by declining to apply section 654 to the criminal threat count. Finally, we find the court erred by staying the sentence on the vandalism and first degree residential burglary counts without first imposing a sentence, and we therefore remand to the court to impose a sentence on these counts.

FACTUAL AND PROCEDURAL BACKGROUND

I.

THE INFORMATION

The prosecution filed an information charging Dugan with: (1) attempted murder of D.P. with premeditation and deliberation (§§ 187, subd. (a), 664, subd. (a); count 1); (2) assault with a deadly weapon, specifically a golf club (§ 245, subd. (a)(1); count 2); (3) criminal threats (§ 422, subd. (a); count 3); (4) vandalism (§ 594, subds. (a) & (b)(1); count 4); and (5) first degree residential burglary (§§ 459, 460, subd. (a); count 5). Regarding counts 1, 2, and 3, the information further alleged Dugan personally used a deadly weapon, a golf club, in the commission and attempted commission of those offenses (§§ 1192.7, 12022, subd. (b)(1)). As to counts 1 and 2, the information further alleged Dugan personally inflicted

2

great bodily injury on D.P. (§§ 667.5, 1192.7, 12022.7, subd. (a)). The case proceeded to trial.

## II.

## THE EVIDENCE AT TRIAL

*A. Prosecution's Case-in-chief*

D.P., his spouse C.P., and their children lived next door to Dugan. The front doors of their houses were in close proximity to each other, approximately 15 to 17 feet away. Around 2020 or 2021, D.P. observed a change in Dugan's behavior. D.P. noticed Dugan would stay awake all night, wandering around his house and garage, hitting things, and making loud noises. Dugan would yell about murder and rape.

Given their close distance to Dugan's house, D.P. and his family began to feel apprehensive about leaving their house and being in the front yard or side of their house. D.P. kept the window shutters facing Dugan's home shut, as Dugan occasionally made comments about D.P.'s family and threw pebbles at the window to get their attention. C.P. had trouble sleeping at night because she was afraid of Dugan.

In June 2021, as D.P. and C.P. were walking to their front door, Dugan yelled at them, saying he intended to murder them, and warned them to "watch out." D.P. feared for his safety and believed Dugan was capable of carrying out the threat.

In August 2021, Dugan smiled at D.P. and yelled, "'I planted bombs in the power lines.'" D.P. called the police. The police responded but left Dugan at his house. Dugan thereafter walked to his truck and smiled at D.P. as he drove away. On another occasion in August 2021, C.P. testified she made an audio recording of Dugan making "loud bangs," "ripping things apart on his house, throwing things out in the street like furniture," tossing

3

rocks at C.P.'s window, and "yelling he was going to give all the neighborhood COVID." C.P. testified Dugan then ran to her door and rammed his body against it.

Between June 2021 and March 2022, D.P. and C.P. called the police 20 to 30 times regarding Dugan because, according to D.P., Dugan "was screaming about murdering [them] and neighbors, . . . murdering police, and raping, . . . killing, and torturing people." The police would respond, knock on Dugan's door, and sometimes yell for him to come out of his house. But Dugan would not answer or come out of his house and the police would leave shortly after. In late February or early March 2022, D.P. installed two security cameras and a deadbolt on his front door.

Approximately on March 7 or 8, 2022, Dugan pointed at D.P.'s window and said, "'That neighbor over there is trying to do this or that to you,' and 'I'm just going to have to take you out.'" Feeling threatened, D.P. called the police, but the police were unable to take any responsive action.

On March 9, 2022, at around 2:30 p.m., D.P. and C.P., who were at home, saw Dugan wandering around his front patio, yelling about murder, and hitting and breaking things with a hatchet and power saw. At some point around that time, Dugan yelled at D.P., "'Neighbor, I'm just going to have to come over and take you out. I'm going to have to kill you. I'm going to have to kill everybody in the neighborhood.'" D.P. felt threatened. C.P. testified Dugan pulled out a knife and yelled he was going to kill D.P. and C.P.,  but D.P. did not see this incident. At roughly 4:00 p.m., C.P. left the house.

Later that day, at around 7:00 p.m., D.P. noticed Dugan's behavior escalating. D.P. saw Dugan climb a ladder to the roof of Dugan's house. Once on the roof, Dugan yelled about D.P. Feeling threatened, D.P. called the police.

4

A couple of minutes later, D.P. heard somebody yelling at his front door. He walked to the door, looked through the window shutters, and saw Dugan standing there. D.P. made eye contact with Dugan, and D.P. thought Dugan appeared agitated and angry. From the window, D.P. could not see whether Dugan was holding anything. Dugan demanded D.P. to open the door and to give him something. According to D.P.'s testimony, Dugan stated that "he was going to have to come in . . . and kill" D.P. Surveillance video footage of the incident was played to the jury. According to the transcript of the video footage, Dugan said: "Give me that box of money right now. Why'd you say bitch? You know how to kick this door down a second[.] Hey, who you gonna? [D.P.] Give me that money." (Boldface omitted.)

Soon after, D.P. heard Dugan kicking the door and, after a couple of kicks, the door swung open. D.P. saw Dugan holding a golf club in his hands. Dugan entered D.P.'s home, swung the golf club with one hand, and hit D.P.'s knee "really hard" with the shaft of the golf club. Despite the pain, D.P. continued to stand. Within a few seconds, Dugan swung the golf club again and hit the back of D.P.'s other leg. D.P. fell on his back. Dugan then tried to hit D.P.'s head with the golf club. D.P. raised his arms to protect his head, after which Dugan struck D.P. three times on his hand and arms.

After the last strike, the golf club snapped in two pieces. Dugan looked confused for a moment, and D.P. "flung" himself into a nearby room. D.P. closed the door, sat up against it, locked it, and listened for movement in the house. After waiting several seconds, D.P. no longer heard Dugan. D.P. left the room, crawled to the couch to retrieve his phone, and called 911. An audio recording of the call was played to the jury.

When law enforcement arrived, they spotted Dugan on his home's roof and heard him making bizarre statements. After an officer was able to calm Dugan down, he was arrested.

## B. The Defense's Case

Among others, a neighbor and a psychologist testified. The neighbor, who lived next door to D.P. and two houses away from Dugan, testified he never witnessed Dugan threaten any neighbors but believed Dugan, at times, appeared delusional and acted "like the neighborhood was under threat." The psychologist testified Dugan suffered from bipolar disorder with psychotic features and a substance use disorder.

### III.

### CLOSING ARGUMENTS

## A. Prosecution

In closing argument, the prosecutor began by asserting: "Dugan is on trial for something that he said and threatened numerous times to [D.P.'s] family. He's on trial for things that he said and did directly to [D.P.], directly to [C.P.]." The prosecutor acknowledged the "mental health component" of the case, but asked the jury to "evaluate the mountain of evidence in showing that . . . Dugan knew exactly what he was doing the night that he tried to kill [D.P.]. That when you look at the background, the context, the motive, everything points that . . . Dugan had the intent to kill [D.P.] that night." In discussing the background, the prosecutor asserted Dugan started threatening D.P. and C.P.—and no other neighbors—in June 2021, when D.P. and C.P. began to call law enforcement regarding Dugan. Moreover, as background, the prosecutor specified two incidents in August 2021, one where Dugan smiled at D.P. as Dugan drove away from his house

6

and another where Dugan rammed his body against the front door of D.P. and C.P.'s house.

The prosecutor set forth the charges against Dugan, reciting counts 1 to 5. As to count 1, the prosecutor argued Dugan's threats against D.P. on March 9, 2022, showed Dugan's intent to kill D.P. The prosecutor asserted: "When [Dugan] is at that specific house on that specific day with that specific weapon, he threatens to kill [D.P.]. He threatens to bash [D.P.]'s head in. He is holding an item specifically capable of making good on that specific threat to bash his head in. [¶] His words are describing a goal-oriented direction of his intent. Words are the ultimate aid in figuring out what somebody's intent is. And we have [Dugan]'s own words. His words align exactly with his choice to go to that house, armed with a weapon." The prosecutor further asserted: "Once that front door is opened, [Dugan] makes good on his other threat to kill [D.P.], to bash his head in. He wastes no time. He goes straight in the home. A threat to kill him like he made in June of 2021, like he made numerous times to [D.P.]'s face, to his home, and calling him neighbor. A threat he had even made that same day on March 9[,] the first time that [D.P.] called the police." The prosecutor contended Dugan's mental health "didn't affect his ability to make threats directly at [D.P.], to look him in the eyes, calling him by name, calling him neighbor before making good on those threats to bash his head in."

## B. Defense

In closing argument, defense counsel contended: "[I]t's hard to trust the honesty of an inconsistent person. And [D.P. and C.P.], neither of them have really been that consistent. And that should be a red flag for you. [¶] [D.P.]'s testimony, it's unreliable. And you need to look at everything else in this case to determine: Was there specific intent in [c]ounts 1, 3, 5; right?

7

How many times did [D.P. and C.P.] provide brand new information? They were recalling things like out of thin air." Defense counsel argued: "The criminal threat, you have to have the specific intent to carry out . . . what the threat is. As you saw, what exactly was the threat? What evidence do you have beyond a reasonable doubt about what the threat was? . . . Because there's no way there's any intent to kill here." Defense counsel also asserted: "My argument for you, ladies and gentlemen, is this: . . . Dugan is saying these crazy things when he's outside that door; right? He's talking about getting money. He's talking about ordering [D.P.] to give him money. He said he's going to kick down the door if he doesn't give him the money. [¶] He doesn't say, 'I'm going to come over there and kick your ass'; right? 'I'm going to assault you. I'm going to beat you. I'm going to kill you.' If you look at the real evidence here, he doesn't say that, and it wouldn't make sense."

Additionally, defense counsel argued Dugan's mental impairment and the influence of drugs prevented him from forming the specific intent for the specific intent crimes charged—attempted murder, criminal threat, and first degree residential burglary. Defense counsel asserted, when Dugan was at D.P.'s front door, Dugan was experiencing a psychotic and manic episode and was under the influence of methamphetamine.

*C. Rebuttal*

During rebuttal, after discussing count 1, the prosecutor asserted: "Criminal threats, you're going to get the jury instructions. It lays out that the intent aspect of criminal threats is that . . . Dugan conveyed a threat and wanted [D.P.] to interpret it as a threat that he could carry out." The prosecutor continued, "We didn't talk about interpretation. [Dugan] carried out the threat. He kicked down the door. We're way beyond the criminal threats in this case. And for the residential burglary, yes, of course,

8

before he enters the home, he must have the intent to commit assault. He was telling him exactly what he was going to do with that golf club, and then he did it."

## IV.

### JURY VERDICT AND SENTENCING

The jury found Dugan not guilty of count 1 and of the lesser included offense to count 1, attempted voluntary manslaughter, but found Dugan guilty of the remaining counts. The jury found true the great bodily injury enhancement and personal use of a deadly weapon enhancement as to count 2. The jury also found true the personal use of a deadly weapon enhancement as to count 3. The trial court sentenced Dugan to 12 years 4 months in prison.

## V.

### RESENTENCING HEARING

A couple of months after sentencing, the trial court held a resentencing hearing. At issue was whether section 654 applied to counts 3, 4, and 5. The court concluded section 654 did not apply to count 3, explaining: "The [section] 422 [violation] was a separate conduct and act. It took place at a different time, and honestly the different location was outside the house in various parts of outside the victim's house. And there were multitudes of [section 422 violations,] honestly[,] based on the evidence that this court heard, and the jury found him guilty on this count. So the court is not going to [apply section] 654 [to] count 3." But the court applied section 654 to

counts 4 and 5, stating, "Counts 4 and 5, 654." The court resentenced Dugan to seven years in prison.[1]

Dugan filed two timely appeals, one from the judgment (G064133) and another from the postjudgment order (G064530). During the pendency of the two appeals, we granted Dugan's motion to consolidate them.

DISCUSSION

I.

THE TRIAL COURT DID NOT ERR BY FAILING TO GIVE A UNANIMITY JURY INSTRUCTION ON COUNT 3

Dugan argues the trial court failed to give a unanimity jury instruction on count 3 (criminal threat). He asserts the prosecution presented evidence of Dugan making several threats but the court did not instruct that the jury must unanimously agree on which act constituted the offense. He contends the court's error violated his federal and state constitutional rights and reversal of the criminal threat conviction is required.

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty. [Citation.] There are, however, several exceptions to this rule. For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when

---

[1] The amended abstract of judgment includes an additional two-year prison commitment as to Orange County Superior Court case No. 21WF2489. That case is not before us.

10

. . . the statute contemplates a continuous course of conduct of a series of acts over a period of time' [citation]. There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime." (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

"Because our consideration of whether the trial court should have given a particular jury instruction involves a mixed question of law and fact which is "'predominantly legal,'" we review de novo whether the specific instruction was required." (*People v. Sorden* (2021) 65 Cal.App.5th 582, 616.)

Here, the trial court did not give a unanimity instruction on count 3. Nor did the prosecution elect the specific act on which it relied to prove the charge. The Attorney General argues the prosecution made such an election in its closing argument, because the prosecution focused on the threats on March 9, 2022, the prosecution cited prior threats only to contextualize the incident on March 9, 2022, and the threats on March 9, 2022, formed a continuous course of conduct . But "[i]f the prosecution is to communicate an election to the jury, its statement must be made with as much clarity and directness as would a judge in giving instruction." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539.) No such clear or direct statement was made here. Even if the prosecution was proceeding under a continuous course of conduct theory, criminal threats pursuant to "section 422 [do] not come within the continuous course of conduct exception."[2] (*People v. Salvato* (1991) 234 Cal.App.3d 872, 883.)

---

[2] Section 422, subdivision (a) provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its

Nonetheless, the same-defense exception applies here. In closing argument, defense counsel consistently argued D.P.'s testimony regarding Dugan's criminal threats was unreliable. Dugan also contended he could not have formed the specific intent for criminal threats because he suffered from a mental illness and was voluntarily intoxicated. Therefore, Dugan's claim of error is meritless.

## II.

### THE TRIAL COURT DID NOT ERR BY FAILING TO STAY THE SENTENCE ON COUNT 3 PURSUANT TO SECTION 654

Dugan argues the trial court erred by failing to stay the sentence on count 3 under section 654, as counts 2 and 3 arose out of an indivisible course of conduct. This argument is unavailing.

Section 654, subdivision (a) provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." "Section 654 'generally precludes multiple punishments for *a single physical act* that violates different provisions of law [citation] as well as multiple punishments for an *indivisible course of conduct* that violates more than one criminal statute.'" (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 94 (*Raymundo M.*).) "Section 654 precludes imposition of an unstayed sentence on the count

face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for their own safety or for their immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

subject to the lesser punishment." (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1042 (*Mejia*).)

"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. [Citation.] '[I]f all of the offenses were merely incident to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, defendant harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."'" (*Mejia, supra*, 9 Cal.App.5th at pp. 1042–1043.)

"'Intent and objective are factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense.'" (*People v. Vasquez* (2020) 44 Cal.App.5th 732, 737.) "In analyzing whether section 654 bars the imposition of multiple sentences, we consider the evidence in the light most favorable to the judgment and affirm the trial court's sentencing decision—whether express or implied—if it is supported by substantial evidence." (*Ibid.*)

"The crime of assault with a deadly weapon has two components: '(1) the assault, and (2) the means by which the assault is committed.'" (*Raymundo M., supra*, 52 Cal.App.5th at p. 85.) "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "For purposes of assault with a deadly weapon under section 245[, subdivision,] (a)(1), 'a "deadly weapon" is "any object,

instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." '"" (*Raymundo M., supra*, 52 Cal.App.5th at p. 85.)

Under section 422, a criminal threat requires the defendant to have, inter alia, "willfully threatened to unlawfully kill or unlawfully cause great bodily injury to" the victim. (CALCRIM No. 1300.)

Here, substantial evidence supports the trial court's implied finding that Dugan harbored separate objectives when he threatened and then assaulted D.P. with the golf club. The court could reasonably have found that Dugan "criminally threatened" D.P. with the "objective of inflicting *mental* or *emotional* harm," while Dugan "committed the assault with the [separate] objective of inflicting *physical* harm on" D.P. (*Raymundo M., supra*, 52 Cal.App.5th at p. 95.) That is, when Dugan threatened to kill D.P. at the front door and demanded money, Dugan intended to instill fear into D.P.; when Dugan assaulted D.P. with the golf club after kicking down the door, Dugan intended to inflict physical harm on D.P.

Dugan contends the prosecution argued in closing argument that "the criminal threat made at the doorway was merely incidental to and a means of accomplishing this primary objective of assaulting or attempting to murder appellant." As the Attorney General points out, this representation of the prosecution's argument is imprecise. During this part of the prosecution's closing argument, the prosecution was focused on count 1, attempted murder, and invoked Dugan's threats to show he had the specific intent to kill D.P. The prosecution asserted: "His words are describing a goal-oriented direction of his intent. Words are the ultimate aid in figuring out what somebody's intent is. And we have [Dugan]'s own words. His words align exactly with his choice to go to that house, armed with a weapon." The prosecutor did not

14

imply the threat at the doorway was merely incidental to the assault. "[A] reasonable trier of fact could conclude that the criminal threats were in furtherance of a separate criminal objective, even if, in part, the threats" were used to demonstrate Dugan's intent to kill. (*Mejia, supra*, 9 Cal.App.5th at p. 1047.)

Additionally, Dugan's reliance on *Mejia* is misplaced. He attempts to analogize the present case to *Mejia*'s application of section 654 to torture, spousal rape, and infliction of corporal injury on a spouse. (See *Mejia, supra*, 9 Cal.App.5th at pp. 1043–1046.) But Dugan ignores the portion of *Mejia* pertinent to the instant case, *Mejia*'s application of section 654 to criminal threats and torture. (See *id.* at pp. 1046–1049.) And that discussion in *Mejia* mirrors our analysis and conclusion *ante*.

Accordingly, the trial court did not err by concluding section 654 did not apply to count 3.

## III.

### THE TRIAL COURT ERRED BY STAYING THE SENTENCING ON COUNTS 4 AND 5 WITHOUT IMPOSING A SENTENCE

"When a court determines that a conviction falls within the meaning of . . . section 654, it is necessary to *impose* sentence and to stay the *execution* of the duplicative sentence. [Citations.] The trial court is required to impose judgment on each count, which involves selecting a term, and then staying execution of the duplicative sentence, the stay to become permanent upon defendant's service of the portion of the sentence not stayed. [Citations.] 'This procedure ensures that the defendant will not receive "a windfall of freedom from penal sanction" if the conviction on which the sentence has not been stayed is overturned.' [Citation.] Thus, it is improper to impose no sentence or to stay *imposition* of the sentence." (*People v. Mani* (2022)

15

74 Cal.App.5th 343, 380.) Under section 654, a court's failure to impose a sentence before staying it "results in an unauthorized absence of sentence." (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1472.)

Both parties agree the trial court erred here. At the resentencing hearing, the court imposed a sentence on counts 2 and 3, but failed to do so on counts 4 and 5. It ruled, "Counts 4 and 5, 654," effectively staying the sentencing on counts 4 and 5 before imposing a sentence. The amended abstract of judgment does not even mention counts 4 and 5. Therefore, as to counts 4 and 5, the sentence is unauthorized, and we must remand the matter to the trial court.

## DISPOSITION

We remand the matter to the trial court with directions to impose a sentence on counts 4 and 5, to correct the abstract of judgment to reflect counts 4 and 5 are stayed, and to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. We affirm in all other respects.


MOTOIKE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


SCOTT, J.


16