Filed 3/18/21  P. v. Morgane CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089698 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE020173) |
| v. | |
| VICTOR MORGANE, | |
| Defendant and Appellant. | |

A jury found defendant Victor Morgane guilty of assaulting and threatening his girlfriend over a period of several hours spanning several different locations.  The trial court sentenced him to an aggregate term of four years eight months in state prison.  Defendant now contends the trial court erred in failing to apply Penal Code section 654[1]

---

[1]  Undesignated statutory references are to the Penal Code.

1

to two of his six counts of conviction--count two, assault with a deadly weapon (mop handle), and count five, criminal threats.  Finding no error, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

We include only the facts and procedural details relevant to defendant's single sentencing claim on appeal.

Defendant and the victim had an "off and on" romantic relationship for four years.  They also had a daughter together.  One night defendant called the victim repeatedly to discuss their relationship.  She turned off her cell phone.  The next morning, defendant arrived unannounced at her home and told her that he would wait for her while she took her older children to school.  When the victim returned with only her toddler daughter, defendant asked the victim whether they were going to "do this" inside or outside.  They went inside the victim's home.

Once inside, defendant slapped the victim (knocking her to the ground) and grabbed her keys and phone from her purse.  As she tried to get up, defendant said, "don't you move" and kicked her twice in her side.  He told their toddler that she was not his child and her mother was a "whore."  He grabbed the victim by her braids and dragged her to her bedroom, pulling out a braid and leaving a bald spot.  He told her:  "I'm going to make you feel everything that you made me feel.  I'm going to make you feel the hurt and the pain that I felt all this time."

For 20 to 30 minutes, he went through her phone, pacing around the room while reading sexualized messages between her and other men.  Every time she asked him to stop, he would hit her on her side with a closed first.  He called her names and accused her of cheating on him.  He hit her in the face with a water bottle, poured the water on her, and slapped her face.  Both before and after he looked at her phone, he told her, "bitch, you are going to die today," and "I'm going to kill you."  She was very scared and believed his threats, because he had never been so angry before.

2

Defendant then grabbed a mop and told the victim: "I'm going to sit here. I'm going to torture you. I'm going to drag this out." He then hit her with the mop handle four or five times on her arms and hand while she blocked her face, until the mop handle bent in half. He straddled her on the bed and looped the ends of her romper belt around his hands, pressing down on her neck for one to two minutes until she felt like she might pass out. As he choked her, he yelled at her and told her she was going to die. As she pleaded for him to stop, he said: "I'm not going to stop anything. . . . [Y]ou really are going to die today. I'm just trying to figure out how. Either I'm going to shoot you . . . I'm going to strangle you . . . I'm going to choke you to death. I'm going to do something." At some point while they were in the bedroom, he told her he had a gun.

Defendant then took the victim and their daughter in the car, claiming he was headed for the victim's "boyfriend's house" and that "this is going [to] go on all day." As defendant drove, he went through the victim's messages and began calling her contacts. He called her male cousin and said he was about to "pull up" on him so he could "watch this bitch get fucked up since you love her so much." He made a U-turn, demanded the cousin's address, and punched the victim in the eye when she refused to provide it.

Eventually defendant called the victim's female cousin. He told this cousin that "This bitch is going to die today. I don't give a fuck who you are to her." Defendant eventually stopped the car at a park. He told the victim to let their daughter go play because "this is about to end right here." The victim initially took his words to mean that he was going to kill her at the park. She thought he would shoot her because he kept telling her that he had a gun and that he would shoot her and motioning like he had a gun in his backpack. She had also seen a gun in a bag in his car's back seat about two months ago, and he had previously mentioned that he's "always protected." They all got out of the car, and defendant accessed his trunk where his backpack was located.

3

The female cousin with whom defendant had been speaking on the phone had apparently located the family at the park and drove up beside them around that same time; the victim and her daughter got into her car and left defendant at the park. The cousin drove the victim to the hospital. The victim had suffered multiple injuries, including a swollen and bruised hand caused by blocking punches and blows from the mop handle.

The entire ordeal lasted approximately four hours; the victim testified that she was "scared to death" the whole time. She testified defendant told her "you are going to die today. I just don't know how yet," approximately four times. The first time was while he choked her, then again before they left the house, and multiple times at the park. Defendant told detectives that he "lost it," and "just wanted her to feel what I feel. The abandonment, pain and hurt, the emotional roller coaster ride, the mental distress that I have." He denied having a firearm or threatening anyone with a firearm.

A jury found defendant guilty of false imprisonment by violence or menace (§ 236/237a; count one), assaulting the victim with a deadly weapon (a mop handle) (§ 245, subd. (a)(1); count two), simple assault (§ 240, subd. (a)(1); count three), inflicting corporal injury resulting in a traumatic condition (§ 273.5, subd. (a); count four), making criminal threats (§ 422; count five), and child abuse (§ 273a, subd. (b); count six).

At sentencing, the trial court found that defendant harbored separate objectives for counts two and five. Thus, it concluded section 654 was not applicable to count five. The court explained that defendant's objective on the assault with a deadly weapon "was to physically hurt" the victim, while his objective on the criminal threats charge was to "instill fear or mental torment." Finding that "the crimes and their objectives" for counts two and five "were predominately independent of each other and or involved separate acts of violence, or threats of violence," the court sentenced defendant to the upper term of four years on count two and one-third the midterm of eight months on count five,

4

consecutive. The court applied section 654 to stay the sentences for count one (three years), count three (180 days), and count four (four years) and imposed a concurrent 180 day sentence for count six.

## DISCUSSION

Defendant argues the trial court erred when it found section 654 did not apply to counts two and five. He contends that contrary to the trial court's findings, defendant's threats throughout the ordeal, including while he assaulted the victim, were part of an indivisible course of conduct showing that defendant harbored a single objective and intent, namely, to cause the victim pain by any means possible. Defendant argues the trial court's distinction between his intent to cause physical harm and his intent to instill fear or mental torment was too narrowly drawn. We disagree, and conclude the trial court's findings are supported by substantial evidence.

Section 654, subdivision (a) provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654 applies not only where there was one act in the ordinary sense, but also where there was a course of conduct that violated more than one statute but nevertheless constituted an indivisible transaction. (*People v. Perez* (1979) 23 Cal.3d 545, 551.)

"Whether a course of conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the 'intent and objective' of the actor. [Citation.] If all of the offenses are incident to one objective, the court may punish the defendant for any one of the offenses, but not more than one. [Citation.] If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of

5

an otherwise indivisible course of conduct. [Citation.]" (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267-268.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

The record here supports the trial court's finding that the assault with the mop handle and the numerous threats involved multiple objectives. "[M]entally or emotionally terrorizing the victim by means of threats is an objective separate from the intent to cause extreme physical pain." (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1047.) The evidence showed that the beating with the mop handle that constituted count two was a relatively brief and discrete physical act within a lengthy period of sustained abusive conduct. In beating the victim, defendant intended to inflict physical pain and suffering on her, which he did. However, in threatening to kill the victim multiple times and in multiple ways--which did not specifically include beating her with the mop handle--defendant intended to impose extended mental anguish. Indeed, defendant stated his express intent to torture the victim over an extended period of time. He said she was going to die "today" and he was "trying to figure out how" to kill her, which prolonged her terror. He said he wanted her to feel the "abandonment, pain and hurt, the emotional roller coaster ride, the mental distress" that he had felt, thus stating his separate objective and intent to cause her emotional pain by instilling fear.

Moreover, unlike defendant's isolated assault with the mop handle, defendant's verbal threats were numerous, and made at different times and in different locations. Separate violations against the same victim may be separately punished where there is

time for reflection between the acts.  (See *People v. Solis* (2001) 90 Cal.App.4th 1002, 1021-1022 [multiple punishment for arson and threats upheld where the defendant left threatening messages, then burned apartment after victims fled]; *People v. Surdi* (1995) 35 Cal.App.4th 685, 688-690 [offenses "separated by considerable periods of time during which reflection was possible"].)  Here, defendant threatened the victim in her home, in the car, and in the park, over a period of hours.

Defendant's threats were also varied in nature.  He did not threaten to kill the victim by the same method as the beating.  (Cf. *People v. Louie* (2012) 203 Cal.App.4th 388, 399 [single act of threatening the victim was the method employed to attain the objective of dissuading a witness; therefore, defendant could not be punished for both criminal threats and dissuading a witness based on a single act].)  He referenced choosing between choking, strangling, and shooting her, but not beating her to death.

Finally, prohibiting multiple punishments under these circumstances would not further the purpose of section 654, which "is to ensure that a defendant's punishment will be commensurate with his culpability." (*People v. Correa* (2012) 54 Cal.4th 331, 341.)  Here, imposing and executing the consecutive sentence for making numerous threats over an extended period of time is consistent with the purpose of section 654.

Because defendant committed multiple and divisible acts with distinct objectives, substantial evidence supports the trial court's decision to decline to apply section 654 to count five.  (See, e.g., *People v. Mejia, supra*, 9 Cal.App.5th at 1047 [a reasonable trier of fact could conclude that the criminal threats were in furtherance of a separate criminal objective than torture, even if, in part, the threats were intended to break the victim down emotionally and to discourage her from attempting to flee]; *People v. Phan* (1993) 14 Cal.App.4th 1453, 1466 [the defendant was properly sentenced under section 654 on both robbery of mother and threat to cut off her son's hand if she did not give more money].)

It follows that defendant's cursory due process claim fails as well.

7

## DISPOSITION

The judgment is affirmed.

/s/
_____
Duarte, J.

We concur:

/s/
_____
Mauro, Acting P. J.

/s/
_____
Krause, J.