Filed 7/5/22  P. v. Fitch CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUSTIN DANIEL FITCH,<br><br>    Defendant and Appellant. | D078987<br><br><br><br>(Super. Ct. No. RIF1502606) |

APPEAL from a judgment of the Superior Court of Riverside County, Mark E. Johnson, Judge.  Convictions affirmed; sentence vacated and remanded with directions.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Daniel Rogers, Assistant Attorneys General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Justin Daniel Fitch of assault on a child under the age of eight resulting in a comatose state (Pen. Code,[1] § 273ab, subd. (b); count 1), child abuse likely to produce great bodily injury (§ 273a, subd. (a); count 2), sexual penetration of a child 10 years of age or younger (§ 288.7, subd. (b); count 3), torture (§ 206; count 4), and misdemeanor resisting a peace officer (§ 148, subd. (a)(1); count 5). It found true an allegation as to count 2 that Fitch personally inflicted great bodily injury on the victim, John Doe (Doe). (§§ 12022.7, subd. (a), 1192.7, subd (c)(8).)

The court sentenced Fitch to a determinate prison term of nine years plus an indeterminate term of 29 years to life as follows: the upper term of six years on count 2, plus three years for the great bodily injury enhancement, plus consecutive indeterminate terms of "seven years to life" each on counts 1 and 4, plus 15 years to life on count 3, and a concurrent one-year jail term on count 5.

Fitch contends the trial court erroneously (1) declined to stay punishment on the torture conviction under section 654 and (2) imposed unauthorized seven-years-to-life terms on counts 1 and 4. In supplemental briefing, he argues that this court should remand the matter for resentencing under the newly-amended version of section 1170. We agree with the latter contention and accordingly affirm the convictions, vacate the sentence, and remand for resentencing as set forth below.

FACTUAL AND PROCEDURAL BACKGROUND

Fitch has not challenged the sufficiency of the evidence to support his convictions; therefore, we summarize the facts mainly to provide context for the first contention. We rely in part on the probation report.

---

[1]     Undesignated statutory references are to the Penal Code.

On April 19, 2015, Fitch babysat Doe, the son of R.H., an old high school friend. When Fitch returned Doe to R.H., he showed her a bruise on Doe's chest, saying it must have happened the previous day, when R.H. had taken Doe to a trampoline park, or from Doe's car seat. R.H. doubted those explanations.

On April 23, 2015, R.H. asked Fitch to babysit Doe from 1:00 p.m. to 4:00 p.m. and Fitch agreed. When R.H. dropped Doe off at Fitch's residence at around 12:30 p.m., Doe cried and appeared like he did not want to be with Fitch. R.H. left for work and a few minutes later, Fitch sent her a text message indicating that in "25 seconds" Doe had stopped crying. He included a photograph depicting Doe in good spirts.

Approximately one hour later, Fitch sent R.H. a text message and attached a photograph of Doe with his hair in disarray, wearing no clothing, and sitting near two piles of vomit. Fitch testified that at one point Doe started moving "robotically"; therefore, Fitch dialed 911 at 2:59 p.m. But he hung up the phone, claiming he thought it better to speak to R.H. first. Fitch later informed R.H. that Doe appeared to be sick, but afterwards he informed her that Doe was fine.

Fitch asked J.B., an acquaintance, to stop by his house to check on Doe. She arrived at Fitch's residence at approximately 4:00 p.m. and observed Doe on the living room couch. She advised Fitch that Doe needed immediate hospital care. She observed that Doe was limp and having difficulty breathing when Fitch lifted him off the couch. She instructed Fitch to call 911 immediately. Fitch responded that Doe was getting better, so he was not going to take him to the hospital. At 4:18 p.m., R.H. instructed Fitch to take Doe to her aunt's house. Fitch stated he would do so shortly.

Fitch called 911 again at approximately 6:30 p.m. At around 6:40 p.m., the sheriff's department and emergency medical personnel were dispatched to appellant's house. They found Doe with lethargy, a fixed gaze, low level of consciousness, high heart rate, trouble breathing, and a fresh circular bruise on his chest. Because of Doe's poor condition, they quickly treated him at the scene and transported him to a regional medical center. Around this time, Fitch called R.H. and told her that Doe was being taken to the emergency room. He had not previously informed her about Doe's serious and deteriorating condition.

Physicians diagnosed Doe with three main groups of injuries: (1) abusive head trauma, significant brain injury and hemorrhage, retinal hemorrhages, and seizures, (2) a punctured anus, rectum and mesentery,[2] and (3) a fresh, raised circular mark on his chest. Doe underwent surgery to repair the punctures to his rectum and mesentery. Doe was in a coma for one month. His injuries have left him developmentally-disabled physically and mentally.

On April 24, 2015, Moreno Valley Police arrested Fitch and transported him to a police station, where he tried to commit suicide and became combative and resistant. Police used a taser device to detain him. They removed his prosthetic leg and noted a circular button on the knee portion of the prosthetic leg that appeared to match a photograph of the bruises on Doe's chest.

*Prosecutor's Closing Arguments*

The prosecutor argued to the jury the basis of each count. Specifically, he argued count 1 "pertains to the brain damage that was done to [Doe],"

---

[2] One doctor at trial defined the mesentery as "the part of the bowel that the blood travels through and holds the intestines in place."

4

"This count is very specific to that particular act that caused that injury, because . . . this charge . . . requires that [Doe] was in a coma."

The prosecutor argued that count 2: "referred to. . . the bruising on [Doe's] chest," claiming the evidence was "very compelling . . . that suction valve [on the prosthetic leg] was used by [ ] Fitch at some point during the hours he was with [Doe] . . . to cause the bruise on [Doe's] chest." The prosecutor explained that count 2 could be proved in two ways: first, "[Fitch], while having care and custody of a child, willfully caused or permitted the child's person or health to be injured." Second, "the defendant while having care and custody of a child willfully caused or permitted a child to be placed in a situation where the child's person or health was endangered." Pointing out that even defense counsel in opening arguments had advocated this second theory, the prosecutor further explained it: "Fitch didn't call 911 after knowing about [Doe's] injuries that [Fitch], while having care and custody of [Doe] caused or permitted the child to be placed in a situation where . . . [Doe's] health was endangered. Not that [Fitch] caused the injuries himself, but that he was in a bad situation. [ ] Fitch should have called 911, and he didn't."

The prosecutor argued that count 3 related to "the abuse to [Doe's] rectum and mesentery," which Fitch caused by "insert[ing] something inside of [Doe's] anus."

The prosecutor argued that the count 4 torture charge encompassed all of Doe's injuries: "[T]he repeated abuse of [Doe by Fitch] in that six hours that he had care of him, that is torture." He added that Doe's injuries "were significant in that the brain hemorrhaging, as a result of the abusive head trauma, was injurious and symptomatic and likely painful to [Doe]. We also know the rectal tear was painful. [¶] I'm willing to bet . . . that that bruise

on his chest was painful too. . . . [¶] Now, [Doe], during the course of those six hours that he was there at the defendant's house, he was bruised in his chest, he was shaken to the point where his brain was bleeding, and his rectum was torn. That didn't happen all at once. [¶] What I ask you to think about, ladies and gentlemen, is the fact that—let's just say for hypothetical purposes, Fitch put something in [Doe's] butt, tore his rectum, and that's what caused the vomiting. You would think that someone who reacted or became angry or frustrated would stop. Or let's say that he shook him and that is what caused the brain to bleed first and that's what caused him to vomit, like we saw in the pictures. You would think that someone who just reacted because they were angry, frustrated, or what have you, whatever causes an individual to be able to do something like that, you would think that they would stop. But no, [ ] Fitch didn't stop. [¶] You've got to think to yourself, what kind of individual does that? What kind of individual thinks to themselves, 'This is not enough. This kid hasn't suffered enough. I've shaken him. He's clearly distressed. He's catatonic,'. . . . [¶] When is it not enough? Again, you have to think to yourself, what kind of person—what kind of mindset . . . a person who continues to abuse a child, what kind of mindset does that person have when they continue to abuse a child after causing one significant injury, whether it's the brain injury or whether it's the rectal tear, or even the bruise for that matter."

*The Court's Ruling on the Section 654 Issue*

At the start of the sentencing hearing, the court said it was inclined to stay the sentence on the torture count under section 654, but it proceeded to hear counsels' arguments. The People argued: "With respect to the torture, the abuse that was inflicted upon [Doe], at least the torturous act in my view . . . and I believe as they were presented to the jury, involved not only the

acts that caused the injuries of abuse of head trauma, but the abuse to [Doe's] chest or the rectum tear of the mesentery tear. [*sic*] [¶] But really, the torturous acts occurred during the entire span of time that [ ] Fitch had [Doe] in his care. And not only abused him in those manners that are contemplated in the other counts, but also the abuse took place when [Fitch] absolutely, [number] 1, continued to abuse [Doe] knowing that he was in despair health wise. [¶] But then, also deriving pleasure from the continued abuse, such that he absolutely refused to call 911 in any substantive manner until at least six hours later, after [Doe] was clearly in distress. [¶] And so it's my view . . . that really the torture that's indicated here is knowing that [Doe] is circling the drain and, essentially, dying in his presence as a result of his actions, and then allowing that young child to continue to suffer, minute after minute, hour after hour, with no inkling whatsoever to try to save this child's life or do anything about saving him or maybe even giving him a better chance at survival or giving him a better chance of having less severe consequences as a result of his accident. [¶] Had [ ] Fitch called 911 after he abused him the first time, around the 12:00 o'clock hour, maybe [Doe] would not be suffering the same kinds of consequences now. Perhaps the bleeding in the—perhaps it wouldn't have been so severe. Perhaps [Doe] would not have the deficits on the left side of his body. Perhaps he could walk without a brace. Perhaps he would not have the speech impediment he has now, or the learning difficulties that he has. [¶] The reality is that [Doe] will for the rest of his life have to deal with the consequences of [Fitch's] choices. And those choices, in my view, . . . were not only made by virtue of [Fitch's] actions against [Doe] physically, but also his inaction. [¶] It's beyond negligence, as [defense counsel] argued, to the jury. This is not negligence. This was

7

deliberate, malicious, sordid and just downright hellacious actions on the defendant's part."

Defense counsel argued for a stay of the count 4 sentence under section 654: "[T]he elements of torture require [a defendant] to inflict great bodily injury upon a person with the intent to cause extreme pain and some specific purpose. [¶] In this case, the prosecution argued it was for a sadistic purpose. But [Fitch is] being punished for inflicting the injuries in counts 1, 2 and 3. And so to argue that not calling 911 soon enough suffices to create a separate event of inflicting great bodily injury on the child, to satisfy a separate event, to call it torture, to justify an additional seven years to life on top of the 22 to life, plus nine the court is already imposing, is the same thing as punishing him twice for the same act, which is exactly what section 654 prohibits. So [Fitch is] being punished for the injury to the brain."

The court declined to stay the sentence on count 4; instead, it ruled the issue "might be close but I think there are acts here in addition to those that were alleged in counts 1 and 3."

## DISCUSSION

### I. *Section 654 and the Stay of Punishment*

Section 654, subdivision (a) as recently amended provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."[3] Section 654 precludes multiple punishments not

---

[3]    As Fitch points out, effective January 1, 2022, Assembly Bill No. 518 (2021-2022 Reg. Sess.) amended section 654, subdivision (a) to permit an act or omission punishable under two or more provisions of law to "be punished under either of such provisions." (§ 654, subd. (a); Stats. 2021, ch. 441, § 1.)

only for a single act that violates more than one statute, but for an indivisible course of conduct. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1208.) Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all the offenses were merely incidental to, or were the means of accomplishing one objective, the defendant may be found to have harbored a single intent and therefore may be punished only once. (*People v. Jackson* (2016) 1 Cal.5th 269, 354.)

At issue here is the sentence for the crime of torture, which requires the infliction of great bodily injury with intent to cause cruel or extreme pain and suffering. (§ 206.) "Torture can be committed either by a single act or by a course of conduct. [Citation.] Where torture is tried as a course of conduct crime, it is not necessary that any single act in the course of conduct results in great bodily injury. Rather, if the requisite intent exists and the cumulative result of the course of conduct is great bodily injury, the crime of torture has been committed." (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1043.) In *Mejia*, the court concluded the defendant could not be punished separately for torture and spousal abuse when the acts underlying the spousal abuse were intertwined with the torture charge. (*Id.* at pp. 1043-1046.) The *Mejia* court ruled: "[A]lthough a defendant may be convicted of both torture and any or all of the underlying acts [citation], section 654 precludes imposition of unstayed sentences for both torture and any of the underlying assaultive offenses upon which the prosecution relies to prove the element." (*Mejia,* at pp. 1044-1045.) Therefore, the imposition of the unstayed sentences on those counts violated section 654 "because all of the

---

Thus, under newly amended section 654, a trial court now has the discretion to punish a defendant under different applicable laws.

acts of spousal rape and infliction of corporal injury on a spouse were included among the acts underlying the torture count and were essential to satisfying an element of that offense." (*Mejia*, at p. 1046.)

Courts consider the acts upon which the prosecutor grounded the prosecution of each charge for purposes of applying section 654. (See *People v. McKinzie* (2012) 54 Cal.4th 1302, 1369 ["The Attorney General concedes . . . that defendant could not be punished for both carjacking and kidnapping for robbery because the prosecutor argued to the jury that the victim's car was the object of the robbery"].) Otherwise, the punishment for the charge will have no relationship to the acts upon which the jury's verdict is based. (See *People v. McCoy* (2012) 208 Cal.App.4th 1333, 1339 ["where there *is* a basis for identifying the specific factual basis for a verdict, a trial court cannot find otherwise in applying section 654"].)

Here, as in *Mejia*, the prosecutor relied on the underlying assaultive offenses to help establish the torture offense, arguing to the jury that the brain damage attributed to count 1, the chest injury related to count 2 and the torn mesentery related to count 3 formed the basis of the torture charge. He even argued to the jury that one way it could convict Fitch on count 2 was by finding he failed to call 911 in a timely fashion, thus prolonging his torture of Doe.[4] Moreover, the evidence did not suggest any objective for the various injuries to Doe other than the statutory criteria for torture, which is "to cause

_____

[4]    In closing argument, Fitch's attorney conceded the evidence showed Fitch likely committed count 2 by his negligent conduct: "[A]nother way you can be convicted of this crime is permitting a child's health to be endangered while you have care and custody. I'll give you this one. There's evidence in this case to prove that [ ] Fitch put that child's health in a situation where it was endangered, and he even told the police on day one—remember?— 'I don't know if this is going to bite me in the ass or not, but I called 911 at around 3:00 [p.m.] and I hung up.' What was he telling them? 'Yeah, you

cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) We therefore conclude that Fitch cannot be punished both for his torture conviction and the other convictions, as section 654 prohibits separate punishment "for both torture and any of the underlying assaultive offenses upon which the prosecution relies to prove that element." (*People v. Mejia, supra*, 9 Cal.App.5th at pp. 1044-1045.)

## II. *Fitch's Other Contentions*

Fitch contends the court erroneously sentenced him to separate terms of "seven years to life" on count 1 and on count 4 (torture), as the sentence for those crimes does not include a minimum term. (§§ 273ab, subd. (b) [punishment for assault on a child resulting in coma due to brain injury is "imprisonment in the state prison for life with the possibility of parole"]; 206.1 ["Torture is punishable by imprisonment in the state prison for a term of life"].)

In supplemental briefing, Fitch contends he is entitled to be resentenced under the amended version of section 1170, because the aggravating factors the court relied on to impose the upper term on count 2 were neither found by the jury nor admitted by Fitch. The People properly concede the amended statute applies retroactively to this case, but claim the court's error was harmless and remand for resentencing is not necessary.

---

know what? I should have called. That kid would have gotten better treatment if I would have called.' He permitted [Doe's] health to be endangered by not reaching out for help sooner. He told you that on the witness stand. He told the police that on April 23rd, 2015." Defense counsel concluded, "If you convict [Fitch] of Count 2, it's because [he] hung up at 2:59 p.m. when he call [*sic*] 911."

Because we vacate Fitch's sentence and remand for resentencing, Fitch may raise the above two issues and the court will have an opportunity to review all of its prior sentencing decisions in light of all new legislation, including Senate Bill No. 567. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425, ["[T]he full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## DISPOSITION

Fitch's convictions are affirmed; his sentence is vacated. On remand, the superior court is directed to conduct any proceedings that may be necessary and resentence Fitch consistent with this opinion and current applicable sentencing laws, and prepare a new abstract of judgment and forward a certified copy of it to the Department of Corrections and Rehabilitation.


O'ROURKE, Acting P. J.

WE CONCUR:


AARON, J.


IRION, J.

13