Filed 9/16/22 P. v. Rojas CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF

CALIFORNIA FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060570 |
| v. | (Super. Ct. No. |
| STEVE CASTRO ROJAS, | 19CF3061) OPINION |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge. Affirmed and remanded for resentencing with directions.

Laura Arnold, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Steve Oetting, Heather B. Arambarri, and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Steve Castro Rojas appeals from the judgment of conviction entered after a jury found him guilty of assault with a deadly weapon, making criminal threats, vandalism, and battery. His sole argument on appeal is that the trial court erred by failing to stay execution of sentence on his conviction for making criminal threats under the version of Penal Code section 654, subdivision (a) that was in effect at the time of his sentencing hearing (former section 654(a)).[1]

We agree and remand the matter for resentencing. Insufficient evidence supports the trial court's implied findings that Rojas had different intents and objectives for the actions underlying his convictions for assault with a deadly weapon and making criminal threats. The trial court, therefore, erred by failing to stay execution as to the criminal threats conviction pursuant to former section 654(a). We otherwise affirm the judgment in its entirety.

## FACTS[2]

During the early evening of November 3, 2019, Adrian Rubio arrived at a park in Santa Ana to meet up with his friend Carlos. While Rubio was seated on the curb near his car, Rojas and his girlfriend, who were about two cars away from Rubio, were engaged in a loud, heated argument. Rubio did not know either Rojas or his girlfriend.

Rojas appeared aggressive and angry; his girlfriend appeared to be scared. During the argument, Rojas yelled at the mother of a family passing by and an "old street vendor"; Rojas asked them what they were looking at. Rubio tried not to pay attention to Rojas and his girlfriend and did not want to get involved in their argument, which continued for 30 to 45 minutes.

---

[1] All further statutory references are to the Penal Code.

[2] The summary of facts is limited to those facts pertinent to the issue presented on appeal and to otherwise provide relevant background.

Carlos finally arrived and parked his car in the parking lot. Rubio had started walking toward Carlos' s car when Rojas called out to Rubio and asked him, "'where you from?'" Rubio did not take Rojas's remark as a challenge but instead figured Rojas was mad and "just going off on anybody he saw."

Rubio responded, "I live here." Rojas walked toward Rubio and asked him if he had any problems with him. Rubio answered: "'No, I don't have a problem. You're the one walking back and forth yelling like a scanless bitch.'"[3] Rojas then punched Rubio, causing a cut on Rubio's face.

Rubio and Rojas started to fight, punching each other. Their fight was brief, ending when Rojas said something to the effect of "'fuck this, I'm gonna go to my car and get my knife'" or "'fuck this, where's my knife'"; Rojas started to walk to his car. Determined to prevent Rojas from retrieving a knife, Rubio followed Rojas. When Rojas opened his car door, Rubio pushed the door shut and then took Rojas to the ground. After holding Rojas down for about 20 seconds, Rojas's girlfriend and Carlos separated the two men.

Rubio got up and started walking with Carlos toward Carlos's car. Rubio, however, saw Rojas go into the backseat of his car and come out of it holding by his waist a small pocketknife with the blade exposed. Rubio said nothing and started running. Rojas's girlfriend grabbed Rojas and tried to stop him, but after Rojas told her to move or he was going to poke her, she looked startled, let go of Rojas, and got out of his way. While holding the knife at his waist with the blade pointed toward Rubio, Rojas began to chase Rubio. During the chase, Rojas called Rubio a "'bitch'" and told him to "get over here because [Rojas] was going to poke [Rubio]." Five times during the chase

___

[3] Rubio testified that by saying Rojas was acting like a "scanless bitch," he intended to point out that Rojas had been very loud and aggressive with anyone in sight. Rubio testified he made this comment because Rojas was "a grown man throwing a tantrum in the middle of the park."

Rojas repeated the statement he was going to poke Rubio; Rubio understood Rojas to mean that he was going to stab Rubio. Rojas never got within five feet of Rubio.

After chasing Rubio for only about 30 to 60 seconds, Rojas appeared to get tired and stopped running. Rubio rejoined Carlos and they got into Carlos's car to leave. However, before Carlos could start the car, Rojas appeared at the car's passenger side and struck the car window with a metal pipe. The window shattered, and Carlos was cut by glass. Rojas then tried to open the car door, but it was locked. He tried to unlock the door from the inside, but Rubio pushed his hand away. Carlos started the car and ultimately drove away from the park.

PROCEDURAL HISTORY

Rojas was charged in an amended information with one count each of assault with a deadly weapon(§ 245, subd. (a)(l)) (count **l);** making criminal threats (§ 422, subd. (a)) (count 2); vandalism(§ 594, subds. (a), (b)(l)) (count 3); and battery (§ 242) (count 4). The amended information alleged, pursuant to sections 667, subdivisions (d) and (e)(l) and 1170.12, subdivisions (b) and (c)(l), Rojas was previously convicted of a serious and violent felony, and further alleged, pursuant to sections 667, subdivision (a)(**1)** and 1192.7, he was previously convicted of a serious felony.

The jury found Rojas guilty on all counts as charged. Rojas admitted the prior conviction allegations.

The trial court sentenced Rojas to a total prison term of five years, four months by imposing a four-year term on count **1** and a consecutive term of 16 months (one-third the middle term doubled pursuant to section 667, subdivisions (d) and (e)(l) and section 1170.12, subdivisions (b) and (c)(l)) on count 2. The trial court also sentenced Rojas to 180 days in the Orange County Jail on each of counts 3 and 4. The

4

prior sentencing enhancement under section 667, subdivision (a)(1) and section 1192.7 was stricken by the trial court for sentencing purposes only.

Rojas appealed.

## DISCUSSION

### I.

### FORMER SECTION 654(a) AND THE GOVERNING STANDARD OF REVIEW

Former section 654(a) provided in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." That statute was intended "to prevent multiple punishment for a single act or omission, even though that act or omission violate[d] more than one statute and thus constitute[d] more than one crime." *(People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.) When a trial court determined former section 654(a) applied to a particular count, the trial court was required to impose sentence on that count and then stay execution of that sentence. *(People v. Alford* (2010) 180 Cal.App.4th 1463, 1466.)[4]

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the

---

[4] Effective January 1, 2022, Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518) amended former section 654(a), "to afford sentencing courts the discretion to punish the act or omission under either provision," without regard to the longest potential term of imprisonment. *(People v. Mani* (2022) 74 Cal.App.5th 343, 351 *(Mani).)*

5

case involves more than a single act-i.e., a course of conduct-do we then consider whether that course of conduct reflects a single "'intent and objective'" or multiple intents and objectives. [Citations.]" *(People v. Corpening* (2016) 2 Cal.5th 307, 311.)

"'"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. . . . [if] Whether the facts and circumstances reveal a single intent and objective within the meaning of Penal Code section 654 is generally a factual matter; the dimension and meaning of section 654 is a legal question.'" [Citation.] ... We review for substantial evidence a trial court's implied finding that a defendant had separate intents and objectives for different offenses." *(In re L.J* (2021) 72 Cal.App.5th 37, 43.)

"'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' [Citation.] However, '[a] reasonable inference may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork; a finding of fact must be an inference drawn from evidence rather than a mere speculation as to probabilities without evidence.' [Citation.] "'By definition, "substantial evidence" requires *evidence* and not mere speculation."' [Citation.]"' *(People v. Grant* (2020) 57 Cal.App.5th 323, 330.)

## II.
### INSUFFICIENT EVIDENCE SHOWED ROJAS HAD SEPARATE INTENTS AND OBJECTIVES IN COMMITTING COUNTS 1 AND 2

At the sentencing hearing, the trial court stated counts 1 and 2 were "separate and distinct crimes" and concluded former section 654(a) was inapplicable without making any further express findings or stating any other conclusions. "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an

6

implied finding each offense had a separate objective.' [Citation.]" *(In re L.J, supra,* 72 Cal.App.5th at p. 43.)

Rojas argues insufficient evidence supports the trial court's finding "[t]here is no 654 issue" with regard to counts 1 and 2. Rojas argues the record shows he committed those two crimes while "engaged in an indivisible course of conduct, with a single objective and a single intent, which was to assault Rubio." We agree.

The record undoubtedly supports the finding Rojas intended to assault Rubio with a deadly weapon. Not only did he chase Rubio while holding a knife pointed in Rubia's direction, he said so, threatening repeatedly to "poke" Rubio. What was Rojas's intent in threatening to poke Rubio? The record shows Rojas was telling Rubio what he intended to do-he was going to poke or stab Rubio-the same intent and objective he had in assaulting Rubio with a deadly weapon. There is no evidence Rojas threatened any form of harm other than poking Rubio with the knife. Rojas did not threaten to poke Rubio before or after the commission of the assault.

Was there evidence supporting the finding Rojas also separately intended to terrorize or at least scare Rubio by making these statements? The Attorney General does not point to any such evidence, and we have found none in our review of the record. The record does not show Rojas had any intent and objective in making criminal threats other than to announce to Rubio his intent to assault Rubio with the knife he was holding and thereafter continue to self-narrate that intent while he chased Rubio. There is also no evidence Rojas was trying to scare Rubio away. To the contrary, Rubio testified that Rojas told him to "get over here" so that he could poke him.

In the respondent's brief, the Attorney General solely cites *People v. Mejia* (2017) 9 Cal.App.5th 1036, 1039 *(Mejia)* to argue it could be reasonably inferred from the record that Rojas stated he was going to poke Rubio, while chasing Rubio with a knife, with the separate intent and objective of frightening Rubio. *Mejia* is factually

distinguishable because in that case there was evidence supporting the finding the defendant had separate intents and objectives.

In *Mejia,* the defendant had engaged in a "three-month campaign" to "'torture, humiliate, break down, and beat down'" his spouse, resulting in his convictions for torture, spousal rape, spousal abuse, and criminal threats. *(Mejia, supra,* 9 Cal.App.5th at p. 1046.) As to the criminal threats offense, the appellate court concluded former section 654(a) did not bar imposition of separate punishment from the punishment imposed for torture, because "mentally or emotionally terrorizing the victim by means of threats is an objective separate from the intent to cause extreme physical pain," an element of torture. *(Id* at p. 1047.)

Here, unlike the circumstances in *Mejia,* there was no evidence Rojas and Rubio knew each other or had any prior history before the incident, history which might have supported a reasonable inference Rojas intended to cause Rubio to feel fear or some other form of emotional harm. Rojas's threats were only made during the course of his 30 to 60 second assault of Rubio in which he ran after him while holding a knife-a context that sharply contrasts with the lengthy campaign of torture at issue in *Mejia.*

Furthermore, the elements of assault with a deadly weapon and making criminal threats do not support the conclusion that Rojas necessarily harbored separate intents and objectives in committing the offenses. The version of CALCRIM No. 875 given in the instant case required the jury to find, inter alia, that Rojas willfully "did an act with (a deadly weapon other than a firearm) that by its nature would directly and probably result in the application of force to a person[.]" The given version of CALCRIM No. 1300 for making criminal threats required the jury to find that Rojas "willfully threatened to unlawfully kill or unlawfully cause great bodily injury to" Rubio and "intended that his statement be understood as a threat and intended that it be communicated to ... Rubio."

8

As evidenced by the jury instructions, the intent elements of the two offenses are not divergent. To conclude that a defendant necessarily acts with the separate intent of causing emotional harm whenever that defendant contemporaneously commits the offenses of making criminal threats and assault with a deadly weapon would establish a rule that section 654 is automatically inapplicable under such circumstances. The Attorney General does not make such an argument. Neither *Meija, supra,* 9 Cal.App.5th 1039, nor any other legal authority we have found, supports such a rule which would, in any event, run afoul of established California Supreme Court precedent: "Because of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an 'act or omission,' there can be no universal construction which directs the proper application of section 654 in every instance. [Citation.]" *(People v. Beamon* (1973) 8 Cal.3d 625, 636-637.)

Instead, we must evaluate section 654's applicability by reviewing the record before us to determine whether it contains substantial evidence (including circumstantial evidence and any reasonable inferences drawn from that evidence), without regard to suspicions or speculation, which supports the finding Rojas had separate intents and objectives in the commission of those two offenses. As discussed *ante,* we have scoured the record and have found no such evidence. (See *People v. Capistrano* (2014) 59 Cal.4th 830, 886, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104, ["""there must be evidence to support [the] finding the defendant formed a separate intent and objective for each offense for which he was sentenced"""]; *People v. Harrison* (1989) 48 Cal.3d 321, 335 ["if all of the offenses were merely incidental to, *or* were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once"], italics added.) Because the record instead shows Rojas's "[doubly] unlawful conduct was united by a single common objective" of assaulting Rubio, and were otherwise merely incidental to that one objective, Supreme Court "precedent dictates that

9

[he] may not be punished more than once under section 654." *(People v. Jones* (2012) 54 Cal.4th 350, 375 (cone. opn. ofWerdegar, J.).)

*In re Raymundo M* (2020) 52 Cal.App.5th 78 *(Raymundo)* does not support a contrary conclusion and is factually distinguishable. In that case, the defendant was a high school student who had known the victim, LS., since elementary school; LS. attended the same high school as the defendant's younger brother. *(Id* at p. 82.) About a week after LS. and the defendant's younger brother had gotten into an argument, LS. was walking to his car near campus when the defendant, the defendant's younger brother, and two other males got out of a car and started "'dogging' LS. (i.e., staring aggressively at him)." *(Id* at p. 83.) The defendant asked LS., "Can you help me with something?" *(Ibid)* LS. saw the defendant holding, at waist-level, what looked like a switchblade knife with the blade exposed. *(Ibid)* The defendant then raised the knife "about head-high" and began "'lunging towards' and chasing LS." *(Ibid)* During the chase, the defendant yelled "'Fuck Maza'" which LS. understood to be a gang reference (although LS. had no gang affiliation). *(Ibid)* When the defendant got within 10 feet of LS., the defendant told him "'You're going to die today.'" *(Ibid)*

The appellate court concluded the juvenile court did not err by implicitly concluding former section 654(a) did not apply to the defendant's commission of the assault with a deadly weapon and making criminal threats offenses, stating: "Substantial evidence supports the juvenile court's implicit finding that [the defendant] acted with separate objectives when he assaulted and then threatened LS. That is, the court could reasonably have found that [the defendant] committed the assault with the objective of inflicting physical harm on LS., whereas [the defendant] criminally threatened LS. with the separate objective of inflicting mental or emotional harm." *(Raymundo, supra,* 52 Cal.App.5th at p. 95, italics omitted.)

In *Raymundo,* the record supported the court's implicit finding that the defendant not only intended to assault LS. but also to terrorize him. In that case,

evidence showed the defendant confronted I.S. with three other males seemingly in response to LS.'s argument with the defendant's younger brother, asked LS. if he could help him with something while the defendant was holding a switchblade knife with an exposed blade, and shouted gang references while running after I.S.

There were no similar circumstances present in the instant case to support a finding Rojas had intended to terrorize or even scare Rubio in addition to assaulting him. Unlike the defendant in *Raymundo,* Rojas did not set a scene of intimidation or toy with Rubio in order to make him afraid. Instead, Rojas's actions showed he had a single intent of harming Rubio physically. When Rojas became dissatisfied with his fistfight with Rubio, he stopped fighting Rubio and said he was going to get his knife instead. Once he got his knife, he threatened Rubio as he ran after him, trying to catch up to him. As discussed *ante,* nothing in the record shows Rojas's threats reflected anything more than Rojas's articulation of his intent to poke Rubio if he were successful in catching up to him.

Given the dearth of evidence of Rubio's intent to do anything other than assault Rojas, we conclude the trial court's finding Rojas harbored separate intents and objectives in his commission of counts 1 and 2, on this record, "parses the objectives too finely" in contravention of the California Supreme Court's admonition in *People v. Britt* (2004) 32 Cal.4th 944, 953. The trial court therefore erred by finding former section 654(a) inapplicable as to those counts.

## III.

### WE REMAND FOR FULL RESENTENCING

"[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.'" *(People v. Buycks* (2018) 5 Cal.5th 857, 893.) Since the original sentencing hearing in this case,

11

former section 654(a) has been amended by Assembly Bill 518 to now provide in part: "An act or omission that is punishable in different ways by different provisions of law *may* be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (Italics added.) Section 654, therefore, now vests the trial court with discretion "to impose and execute the sentence of *either* term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." *(Mani, supra,* 74 Cal.App.5th at p. 379, italics added.) Furthermore, "[b]ecause Assembly Bill 518 was enacted while defendant's appeal was not yet final and it provides the trial court new discretion to impose a lower sentence, defendant is entitled to its ameliorative benefit. [Citations.]" *(Ibid;* see *People v. Jones* (2022) 79 Cal.App.5th 37, 45 [same].)

The application of section 654, subdivision (a) as amended will therefore require the trial court, at a minimum, to consider which term on counts 1 and 2 to stay under that code section. "As part of that process, the court should also be free to reconsider any other components of the aggregate sentence it [previously] crafted .... *(People v. Ramirez* (2019) 35 Cal.App.5th 55, 64 ['"When a case is remanded for resentencing by an appellate court, the trial court is entitled to consider the entire sentencing scheme'"]; see *People v. Burbine* [2003] 106 Cal.App.4th [1250,] 1257-1258 [full resentencing appropriate given the '"interlocking nature'" and 'inherently integrated nature' of felony sentencing for a multiple-count conviction].)" *(People v. Jones, supra,* 79 Cal.App.5th at p. 46.)

DISPOSITION

We remand for the trial court to conduct a full resentencing hearing. We direct the trial court to exercise its discretion to stay execution of sentence on either count 1 or count 2 pursuant to Penal Code section 654, subdivision (a), as amended by Assembly Bill 518. We further direct the trial court to prepare an amended abstract of

judgment and to forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.



                                              MOTOIKE, J.

I CONCUR:


O'LEARY, P. J.

Bedsworth, J., Dissenting.

I respectfully dissent.

Appellant here did two things: he chased victim Rubio with a knife (the assault count) and he verbally threatened him with bodily harm (the criminal threats count). The threats not only did nothing to promote the assault, they were *counterproductive* to it. They alerted Rubio to the gravity of his situation and caused him to flee.

So appellant's threats made it *less* likely he would be able to accomplish the objective of stabbing his victim. I have difficulty with the idea that two things that operate so clearly at cross purposes can be said to be part of the same objective.

The trial judge concluded - I think quite reasonably - that since the threats made it more difficult to accomplish the assault, they were likely done for another reason: to frighten the victim. Since frightening and stabbing are two different things, he decided to punish for both.

I think that conclusion is not only logically sound but wholly in keeping with human experience: You tell someone you're going to stab them not because it is somehow part of the stabbing but because you want them to be afraid - you want to inflict not merely physical harm but emotional harm. Here, appellant's threats guaranteed that if he was unable to actually stab Rubio, he would at least be able to scare him to death. Those are two quite different things, and I can't quarrel with the trial judge who listened to the witnesses and concluded that's what was going on.

I cannot say whether I would have come to that conclusion had I been in the trial court and heard the witnesses. But neither can I say there was no substantial evidence to support the conclusion of the judge who *was* there. His decision is supported by having seen and heard the witnesses and being in a better position than I to evaluate how harrowing this experience was. It is also completely in keeping with my own

I

concepts of logic and life experience and - more importantly - with the logical processes and experiential analysis of other courts, as represented by prior reported decisions - most notably, *In re Raymundo M* (2020) 52 Cal.App.5th 78 *(Raymundo M.)* and *People v. Mejia* (2017) 9 Cal.App.5th 1036 *(Mejia).*

The facts are undisputed. After verbally provoking Adrian Rubio and punching him in the face, appellant announced he was going to retrieve his knife from his car, did so, and chased him with it. During the chase, appellant called Rubio a bitch and repeatedly said he was going to "poke" him. Rubio was terrified; he understood "poke" to mean "stab." As a result, while appellant got within five to seven feet of Rubio during the chase, he was never able to catch him and carry out the threat. Finding Penal Code[1] section 654 inapt in this scenario, the trial court sentenced appellant to four years for assaulting Rubio with a deadly weapon, plus 16 months for criminally threatening him.

Under section 654, a defendant cannot receive multiple punishment for a single act or an indivisible course of conduct that results in multiple offenses. (§ 654, subd. (a); *People v. Deloza* (1998) 18 Cal.4th 585, 591.) But appellant's convictions for assault with a deadly weapon and making a criminal threat were based on different acts, i.e., physically chasing Rubio with the knife and verbally threatening to stab him. Therefore, the success of his appeal turns on whether his actions constituted an indivisible course of conduct.

Whether a course of conduct is indivisible depends on the intent and objective of the defendant. *(People v. Correa* (2012) 54 Cal.4th 331, 336; *People v. Harrison* (1989) 48 Cal.3d 321, 335.) Generally, if the defendant's crimes reflect multiple criminal objectives, they will be considered divisible, and multiple punishment is permitted. *(People v. Beamon* (1973) 8 Cal.3d 625, 639; *People v. Blake* (1998) 68

---

[1] All further statutory references are to the Penal Code.

Cal.App.4th 509, 512.) But if the defendant's crimes were "merely incidental to, or were the means of accomplishing or facilitating one objective," they will be considered indivisible, and he may be punished only once. *(People v. Harrison, supra,* 48 Cal.3d at p. 335.)

A trial court's finding - express or implied - the defendant harbored multiple criminal objectives for purposes of section 654 is a factual call. It is subject to review under the substantial evidence standard. *(People v. Coleman* (1989) 48 Cal.3d 112, 162; *People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.) While the majority acknowledges this, they do not flesh out the substantial evidence standard or use it to guide their analysis. The result is that a very important part of the section 654 analysis is obscured.

It is important to remember "'[t]he defendant's intent and objective [for purposes of applying section 654] present *factual* questions for the trial court .… [Citation.]'" *(People v. Petronella* (2013) 218 Cal.App.4th 945, 964, italics added.) Under the substantial evidence test, "our review is limited to the determination of whether, upon review of the entire record, there is substantial evidence of solid value, contradicted or uncontradicted, which will support the trial court's decision. In that regard, we give great deference to the trial court and resolve all inferences and intendments in favor of the judgment. Similarly, all conflicting evidence will be resolved in favor of the decision." *(People v. Kurey* (2001) 88 Cal.App.4th 840, 848-849, fns. omitted; accord, *People v. Petronella, supra,* 218 Cal.App.4th at p. 964.)

In purporting to apply this standard, the majority accepts appellant's argument that his threats to poke Rubio reflected no other criminal objective than to carry out the threats. But in finding appellant guilty of making a criminal threat, the jury found he intentionally uttered statements that were so clear, unconditional and specific that they reasonably caused Rubio to be in sustained fear for his personal safety. (§ 422; CALCRIM No. 1300.) Although appellant does not dispute that finding, my colleagues

3

conclude his threats were not punishable because they were simply a verbal expression of his intent to execute the assault.

Appellant's threats were not necessary to carry out the assault, nor did they facilitate its commission. In fact, they lessened appellant's prospects of actually accomplishing his stated goal. In that sense, the threat - which appellant repeated half a dozen times during the chase - was not merely a hollow expression of antagonism. It was more likely an attempt to inflict a different kind of pain: fear. At least, that is one reasonable interpretation of the evidence, which the trial court was free to adopt.

Appellant's attorney recognized the emotional impact of appellant's threats. During her closing argument, she tried to downplay the threats as "trash talk," but one of the primary reasons people talk trash during a confrontational situation is to frighten and intimidate their opponent. When, as here, that talk rises to the level of a criminal threat, i.e., a statement which causes the victim to be in sustained fear for his or her own safety, the emotional impact of those words should not be lightly dismissed.

California courts have recognized that threats are often used to inflict mental and emotional distress that is separate and distinct from the physical harm associated with the primary offense. For example, in *Raymundo M, supra,* the court ruled there was sufficient evidence to find the defendant harbored multiple intents while threatening the victim during a knife chase. The defendant argued his crimes of assault with a deadly weapon and making a criminal threat were part and parcel of each other for purposes of section 654. But the court discerned different intents from the defendant's acts of chasing the victim with a knife, on the one hand, and telling the victim he was going to die, on the other. In upholding the imposition of punishment for both acts, the Court of Appeal held the trial court "could reasonably have found [the defendant] committed the assault with the objective of inflicting *physical* harm on [the victim], whereas [he] criminally threatened [the victim] with the separate objective of inflicting *mental or emotional* harm." *(Id.* at p. 95; accord, *Mejia, supra,* at p. 1047 [for purposes

4

of section 654, "mentally or emotionally terrorizing the victim by means of threats is an objective separate from the intent to cause extreme physical pain"].)

The majority attempts to distinguish *Raymundo M* and *Mejia* on the basis they involved more harrowing circumstances than in our case. But the reason Rubio ran away from appellant is because he did not want appellant to plunge the knife he was holding into his body. In other words, Rubio was literally running for his life as a result of appellant's words and actions. That seems pretty scary to me. Nor should we be second-guessing, from this remove, how frightening the facts were after a jury and a trial judge have deemed them sufficient to cause sustained fear. And even if Rubio was not *as* terrorized as the victims in *Raymundo M* and *Mejia,* it's a difference of degree rather than kind. Their reasoning should still apply.

As in *Raymundo M* and *Mejia,* the trial court here could reasonably find appellant's assaultive and threatening behavior evinced the dual intent to both physically harm Rubio and to cause him emotional anguish. Although the threats occurred during the commission of the assault, there is substantial evidence to support the trial court's implied finding the two crimes were not indivisible so as to prohibit multiple punishment under section 654. I would defer to the trial court's well-supported judgment on this point and affirm its sentencing decision.

BEDSWORTH, J.

5