Filed 10/23/23  P. v. McClung CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C097590 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-185347) |
| v. | |
| BRADLEY JAMES McCLUNG, | |
| Defendant and Appellant. | |

Early one morning, defendant Bradley James McClung entered Steven I.'s home and while severely beating Steven for approximately one hour, repeatedly claimed that he was sent by God to kill Steven.  A jury found defendant guilty of multiple charges, including attempted murder and making criminal threats.  On appeal, defendant contends the trial court made numerous sentencing errors, including:  (1) failing under Penal Code[1]

---

[1]     Undesignated statutory references are to the Penal Code.

1

section 654 to stay sentence on either the attempted murder or criminal threats conviction; (2) imposing two five-year prior serious felony conviction enhancements in violation of section 1385; (3) imposing multiple enhancements in violation of section 1385; and (4) failing to stay the great bodily injury enhancement attendant to a substantive assault conviction that was stayed. We agree section 654 required the trial court to stay the sentence imposed on either the attempted murder or criminal threats conviction. Accordingly, we must vacate the sentence and remand the matter for a full resentencing. Given this conclusion, we need not address defendant's other claims of sentencing error.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2022, Steven, a retired Sacramento County sheriff's deputy, lived alone with his two dogs. Early one morning, he was awakened by extremely loud banging. He looked out his bedroom window into his backyard and saw defendant[2] repeatedly swinging a metal lawn chair at the dog door insert in the sliding glass door and hitting it with extreme force. Steven yelled down through the bedroom window for defendant to stop and to get away from the house. Defendant looked up and continued hitting the house with the chair. Steven could hear defendant speaking, but not what he was saying. At one point, defendant moved away from the dog door and closer to Steven and said "something about he had heard a child screaming and that he was there to save the child from [Steven] being a pedophile, and he was God's -- he was sent by God as God's messenger to kill [Steven]." Steven was startled by the fact that defendant was in his yard, and again told defendant to get out of his yard. Steven took defendant's threat seriously, but since defendant was nowhere near him, Steven was inside the home and

---

[2]    There is no claim on appeal challenging defendant as the perpetrator.

defendant was outside, he did not feel personally threatened. Defendant then went toward the exit to the front yard.

Steven got dressed and armed himself with his gun. He went downstairs, toward the front yard. He let his dogs out the front door and then saw defendant standing across the street. Defendant saw Steven and started to run away. Steven turned in the opposite direction to go back into the house and call 911. He walked back into his house and left the front door open, as the dogs were still outside. His cell phone battery was dead, so he knelt down and reached under a table to get the charging cord, when he was hit on the back of the head, tackled in a bear hug, and dragged to the center of the room.

Steven was on his stomach and defendant repeatedly hit him very hard on the back of his head. Steven and defendant struggled over Steven's gun. The gun slid out of their hands and away from them. Then, defendant rolled Steven onto his back and straddled Steven's hips and put his knees on Steven's forearms. Steven could not block his face or defend himself in any way. Defendant hit Steven in the face with a closed fist using both hands. Defendant threatened to kill Steven at least four times, stating "this is what we do to pedophiles in prison," and again claimed "he was God's messenger and there to kill" Steven. Defendant also saw the badge on Steven's gun and repeatedly stated how much he hated "cops."

Steven yelled for help. Defendant told Steven to "keep screaming" because it would weaken him. Defendant would threaten to kill Steven and then start hitting him again. For about 40 or 50 minutes, defendant alternated between threatening Steven and hitting him. Steven tried to convince defendant there was no one else in the house, but defendant kept hitting him. Steven's face and eyes had swollen, his eyes swelling completely shut so he could no longer see. He laid still to make defendant think he was no longer fighting back, and at some point defendant jumped up and ran outside. When defendant left, Steven crawled to the phone and called 911.

3

Although Steven had not been concerned about his safety when defendant was outside, once defendant tackled him, Steven believed defendant intended to kill him. Steven believed defendant "had something in [defendant's] head that [Steven] was a pedophile and that God had sent [defendant] there to kill [him]" and this belief "seemed to be [defendant's] driving force. And it literally was what was making [defendant] angry and what was making [defendant] assault [Steven]." Steven was in fear of being killed the entire time defendant was attacking him on the floor of his home. Steven believed if he lost consciousness defendant would continue to hit him until he was dead.

While he was being treated by emergency personnel, Steven saw defendant standing near a neighbor's house. Defendant came back across the street almost into Steven's yard and Steven yelled, "[T]here he is." A Rocklin police officer then handcuffed and arrested defendant. DNA samples from the gun matched Steven, defendant, and an unknown third person.

As a result of the beating, Steven's eyes were swollen shut, his entire face was swollen, his nose broken, he had two 17-millimenter hematomas in the back of his skull, and he sustained a traumatic brain injury. The hematomas caused him to lose his equilibrium, which caused him to fall. The traumatic brain injury caused him to lose his memory. He underwent extensive physical therapy before he could walk without assistance, required speech therapy to learn to talk again, and continues trauma therapy for the event itself.

A jury found defendant guilty of attempted murder; first degree residential burglary; battery with serious bodily injury; assault with means of force likely to produce great bodily injury; criminal threats; false imprisonment by violence; and resisting, obstructing, and/or delaying a peace officer or emergency medical technician. The jury also found true as to the burglary, that a person not an accomplice was present during the burglary; as to the battery, that defendant personally inflicted serious bodily injury as alleged; and as to the assault, that defendant personally inflicted great bodily injury as

4

alleged. In bifurcated proceedings, the trial court found true that defendant had sustained two prior serious felony convictions and that his convictions as to five counts were strikes under the "Three Strikes" law. The trial court also found circumstances in aggravation true beyond a reasonable doubt, including that the crime involved great violence, bodily harm, and disclosed a high degree of cruelty; defendant had engaged in violent conduct indicating he was a serious danger to society; his prior convictions were numerous and of increasing seriousness; and he had served a prior prison term.

As to the criminal threats and attempted murder convictions, the trial court considered the application of section 654 and concluded: "Here there were multiple threats to the victim that occurred before and during the beating. [¶] First, in the back yard, the defendant tried to break the back dog door and enter the home. The victim yelled at him to stop. The defendant continued, yelling that he was [t]here to save a child, called him a child molester, and stated in the back yard he was sent by God to kill him. The victim was startled at that time, grabbed his gun, confirmed it was loaded, and went downstairs. [¶] The defendant had left the back yard at that time, went to the front, where at some point the victim opened the front door, locked eyes with the defendant, then turned his back and went back into the house. At that point in which -- the victim was stormed and tackled by the defendant who entered his home and permitted -- proceeded to beat him and commit the attempted murder. During which he also at that time yelled that he was -- had threatened to kill him. [¶] Given this scenario and the facts of this case, I find that the [section] 422 conduct before the entry is separate and distinct in the attempted murder when he finally entered the home and [section] 654 does not apply. The [c]ourt does have discretion to run this concurrently; however, I decline to do so given the separate threats and conduct in the back yard consistent and distinct from inside the home. Therefore that shall be a consecutive term."

The trial court sentenced defendant to an aggregate term of 52 years to life plus 13 years, as follows: nine years to life, tripled to 27 years to life, for the attempted murder,

5

plus 10 years for the two prior serious felony convictions; a consecutive 25 years to life for the criminal threats, plus three years for the great bodily injury enhancement attendant to the assault charge; and a concurrent 364 days on the misdemeanor resisting a peace officer conviction. The trial court imposed and stayed sentence under section 654 on the remaining counts, including the assault charge.

## DISCUSSION

Defendant contends the trial court erred by imposing consecutive sentences for his attempted murder and criminal threats convictions, in violation of section 654, as the acts were part of a single indivisible course of conduct. Defendant argues (1) there was insufficient evidence to find his conduct in the backyard constituted criminal threats as there was no evidence Steven was in fear as a result of his threats at that time, and (2) the evidence does not support a finding that he harbored multiple criminal objectives when he threatened to kill Steven inside the house. We agree.

Section 654, subdivision (a) provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." "Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

6

"In any section 654 inquiry, the court must initially ascertain the defendant's objective and intent. [Citation.] ' "If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." ' [Citation.] 'Whether the defendant maintained multiple criminal objectives is determined from all the circumstances and is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it.' " (*People v. Tom* (2018) 22 Cal.App.5th 250, 260.) "Whether a particular offense is part of a course of conduct for purposes of section 654 is a question of fact. [Citation.] In the absence of an explicit ruling by the trial court at sentencing, we infer that the court made the finding appropriate to the sentence it imposed, i.e., either applying section 654 or not applying it." (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1045.) We review the trial court's findings for substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

The trial court made explicit findings as to the section 654 issue. The trial court found there were multiple threats both before and during the beating. The court found defendant threatened to kill Steven when he was in the backyard trying to break the dog door, and after he left and returned to the home defendant made additional threats to kill Steven as he was beating him. The trial court found the threats before the entry into the home were separate and distinct from the threats and attempted murder inside the home.

As to the conduct in the backyard, there is no substantial evidence supporting the finding that the threats in the backyard were separate *criminal* threats from those made while defendant was beating Steven. That is, there is not substantial evidence supporting two distinct criminal threats. A completed criminal threat requires, among other things, that the threat actually cause the threatened person to be in sustained fear for his, her, or their own safety. (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.) Where "the threat does not actually cause the threatened person to be in sustained fear for his or her [own]

7

safety," even when "that person reasonably could have been placed in such fear," the defendant has not completed the offense of a criminal threat, but rather has committed an attempted criminal threat. (*Id*. at p. 231, italics omitted.) Steven testified he did not feel personally threatened by the threats defendant made while Steven was inside the home and defendant was outside. It was not until defendant was assaulting Steven, attempting to kill him, that Steven was in sustained fear for his safety. Thus, there is not substantial evidence supporting the finding that the threats made in the backyard were distinct criminal threats from those during the attempted murder.

The People argue we should affirm the trial court's ruling because defendant "harbored different intents and objectives in committing the crimes of criminal threats and attempted murder, and there were breaks in the action between the offenses." The defendant's intent and objective are factual questions for the trial court. Given the trial court's explicit findings as to the applicability of section 654, we do not infer findings that the court concluded defendant harbored different intents in the criminal threats inside the home and the attempted murder. The People cite no authority suggesting we may do so.[3] The People's argument relies largely on the different statutory intents underlying attempted murder and making criminal threats; i.e., the attempted murder was motivated by intent to kill, and the criminal threats were motivated by intent to frighten. But, the applicability of section 654 "turns on the defendant's objective in violating both provisions, not the Legislature's purpose in enacting them." (*People v. Britt* (2004) 32 Cal.4th 944, 952, italics omitted.)

---

**3** The People rely on the rule that we may affirm a judgment that is right upon any legal theory applicable to the case. While we can uphold a trial court's ruling on an alternate *legal* theory, the question of whether there were separate intents or objectives is a factual question, not a legal one. (*People v. Jackson* (2016) 1 Cal.5th 269, 354; *People v. Perez* (1979) 23 Cal.3d 545, 552, fn. 5.) The People cite no authority suggesting we can uphold a trial court's ruling based on alternate facts to those found by the trial court.

The People do not point to any evidence, and we have not found any in the record, that suggests defendant had any intent or objective in making the criminal threats other than to articulate his intent to kill Steven. By contrast, the conclusion that defendant operated from a single intent and objective is supported by Steven's testimony that the driving force behind defendant's actions was his belief that Steven was a pedophile and God had sent him to kill Steven. This conclusion is also consistent with the prosecutor's closing argument that defendant's driving thought and intent, from beating the back door through coming into the house and tackling and attacking Steven was, "I'm going to kill him." His intent was set from the beginning and never changed. "[D]efendant knew that he was there to kill [Steven], [and] he made sure [Steven] knew it." Thus, the threats were incidental to his primary objective, to kill Steven. (See *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1346.)

Moreover, to conclude that a defendant necessarily acts with the separate intents of causing physical and emotional harm to the victim whenever that defendant contemporaneously commits the offenses of making criminal threats and attempted murder would establish a rule that section 654 is automatically inapplicable under such circumstances. We have found no legal authority that would support such a rule. Rather, because of the varying circumstances of criminal conduct, there is no universal construction directing the proper application of section 654 in every circumstance. (*People v. Beamon* (1973) 8 Cal.3d 625, 636-637.)

Because there is not substantial evidence that the conduct in the backyard was a completed criminal threat, there is not substantial evidence to support the trial court's finding that the threats before the entry were separate and distinct from the threats and attempted murder inside the home. Thus, the trial court should have stayed the sentence for either the attempted murder or criminal threats conviction. With the passage of Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441), the trial court now has discretion to choose to stay the longer term or terms and impose a lower sentence.

9

(§ 654, subd. (a).) Accordingly, we must vacate defendant's sentence and remand the matter for a full resentencing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.) Given this conclusion, we need not address defendant's additional claims of sentencing error. The parties and the trial court will have the opportunity to address these issues at the time of resentencing.

## DISPOSITION

The sentence is vacated and the matter is remanded for a full resentencing. (*Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1254-1255.)


/s/
ROBIE, Acting P. J.


We concur:


/s/
RENNER, J.


/s/
KRAUSE, J.